1999 UT 18

**CRAFTSMAN BUILDER'S SUPPLY, INC., a Utah corporation, Plaintiff and Appellant,**

.v.

**BUTLER MANUFACTURING COMPANY, a Delaware corporation, and U.S. Construction, Inc., a Utah corporation, Defendants and Appellees.**

No. 970345.

Supreme Court of Utah.

March 5, 1999.

Taylor D. Carr, Trent J. Waddoups, Salt Lake City, for Craftsman Builders.

Royal I. Hansen, Salt Lake City, for Butler Manufacturing.

George T. Naegle, Salt Lake City, for U.S. Construction.

RUSSON, Justice:

¶ 1 Craftsman Builder's Supply, Inc., appeals from the district court's entry of summary judgment barring its claims against defendants. Craftsman sued Butler Manufacturing Company and U.S. Construction, Inc., for damages arising out of the collapse of Craftsman's building. The district court held that Utah Code Ann. § 78–12–25.5 (1996) (the "builders statute of repose") barred Craftsman's causes of action. We affirm.

## BACKGROUND

¶ 2 In 1977, Craftsman entered into a contract with U.S. Construction wherein U.S. Construction agreed to locate and erect a prefabricated metal building for Craftsman. Pursuant to the specifications provided by Craftsman, the roof of the building was to withstand forty pounds per square foot. U.S. Construction ordered the building from Butler and erected it in 1978. Fifteen years later, on February 25, 1993, the roof of the building collapsed under the weight of snow.

¶ 3 On February 24, 1995, Craftsman sued Butler, seeking damages under theories of products liability, breach of express warranty, breach of implied warranty of

merchantability, and negligence. Craftsman later amended its complaint, adding U.S. Construction as a defendant. Thereafter, U.S. Construction moved for summary judgment, arguing that Craftsman's claims were barred by the applicable statutes of limitation and by the builders statute of repose. The district court agreed and, on August 19, 1996, granted U.S. Construction's motion.

¶ 4 First, the court held that the products liability action was filed within the two-year products liability statute of limitations. The products liability statute requires the action to be brought within two years from the time that both the harm and its cause were discovered or should have been discovered. *See* Utah Code Ann. § 78–15–3 (1996). Because the court found no evidence that Craftsman should have discovered its action prior to February 25, 1993, the products liability action filed on February 24, 1995, was within the limitations period.

¶ 5 Second, the court held that the contract to locate and erect a prefabricated metal building was predominantly a contract for the sale of goods and, as a result, the Uniform Commercial Code's ("UCC") four-year statute of limitations applied. *Id.* § 70A–2–725 (Supp.1998). Section 70A–2–725 provides in part:

> (2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

Craftsman argued that the transaction was for the sale of services and, thus, the UCC statute of limitations should not apply, but that even if it did apply, the written specifications that the roof was to withstand forty pounds per square foot constituted a warranty explicitly extending to future performance. Therefore, Craftsman asserted, its warranty causes of action did not accrue until 1993 when the building collapsed. The court rejected this argument and held that the references in the building's specifications to "a live load of 40" and "40# psf LL" did not "create a credible issue of material fact that an *explicit* warranty was given" and that, as a result, the warranty claims were barred.

¶ 6 Third, the court held that under Utah Code Ann. § 78–12–25(3), an action for negligence must be brought within four years from the date on which the negligent act giving rise to the claim occurred and that any negligent act by U.S. Construction occurred in 1978; thus, the negligence claim was barred.

¶ 7 Fourth, the court held that in any event, all the claims, including the products liability claim, were subsumed and barred by the builders statute of repose. *See* § 78–12–25.5 (1996).

¶ 8 On October 23, 1996, Butler moved for summary judgment, arguing, as U.S. Construction did, that Craftsman's claims were barred by the applicable statutes of limitation and by the builders statute of repose. Craftsman opposed the motion, arguing that the builders statute of repose was unconstitutional under article I, section 11 of the Utah Constitution (the "open courts" clause). In granting Butler's motion, the court ruled that the applicable statutes of limitation and the builders statute of repose barred Craftsman's claims as set forth in its ruling on U.S. Construction's motion. The court also held that the builders statute of repose was constitutional.

¶ 9 Craftsman now appeals. First, Craftsman argues that the builders statute of repose violates the open courts clause and thus cannot operate to bar any of its claims. Craftsman further argues that the applicable statutes of limitation cannot bar its claims for the following reasons: (1) The warranty claims are not barred because the contract was for services, not goods, and, thus, the UCC statute of limitations does not apply. Alternatively, if the UCC statute applies, then the specification that the building's roof withstand forty pounds per square foot constituted an express warranty which extended to future performance; thus, the express warranty claim falls within the discovery rule provision of the UCC statute of limitations

and is not barred. (2) The negligence cause of action is not barred because it did not accrue, and its four-year statute of limitations did not start to run, until the building collapsed in 1993 and Craftsman suffered damage. (3) The products liability claim is not barred because, as the court had previously held, it was filed within the two-year statute of limitations for products liability claims.

¶ 10 Second, Craftsman argues that even if the builders statute of repose is constitutional, then (1) it does not bar Craftsman's claims because the plain language of the statute provides that the periods of repose are "subject to" a discovery rule, and Craftsman brought its claims within two years after discovery; (2) it does not bar Craftsman's breach of express warranty claim because the alleged warranty that the roof withstand forty pounds per square foot extended beyond six years and was thus preserved under the terms of the statute; and (3) it does not bar Craftsman's products liability claim because the products liability statute of limitations is more specific and should apply instead of the broader builders statute of repose.

¶ 11 Therefore, the threshold issue before us is whether the builders statute of repose is constitutional under the open courts clause. Because we hold that the statute is constitutional, the remaining issues we must address are (1) whether the repose periods are "subject to" a discovery rule; (2) whether there was a warranty extending beyond six years, thus rendering the statute of repose inapplicable to the express warranty claim; and (3) whether the products liability statute of limitations should apply instead of the builders statute of repose, because the prod-

ucts liability statute is the more specific statute.

## STANDARD OF REVIEW

■ ¶ 12 Summary judgment is appropriate only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). When reviewing a grant of summary judgment, we review the district court's conclusions of law for correctness. *See Taylor v. Ogden Sch. Dist.,* 927 P.2d 159, 162 (Utah 1996).

## ANALYSIS

### I. OPEN COURTS CLAUSE

¶ 13 We first address the constitutionality of the builders statute of repose under the open courts clause of the Utah Constitution. That statute provides that actions for injury to persons or property arising out of an improvement to real property must be brought within a certain number of years of the triggering event. *See* Utah Code Ann. § 78–12–25.5 (1996).[1] If the action is for breach of contract or warranty, then the action must be brought within six years after completion of the improvement or abandonment of construction; if the breach is discovered in the sixth year, however, then the injured party has two additional years from the date of that discovery in which to bring the action. *See id.* § 78–12–25.5(4).[2] All other actions, e.g., those based in tort, must be brought within twelve years after completion or abandonment, unless the act or omission giving rise to the action is discovered in the twelfth year, in which case the injured party has two years from the date of that discovery to commence the action. *See id.* § 78–12–25.5(5).[3] In any case, if the act or

---

1. Utah Code Ann. § 78–12–25.5 (1996) was amended in 1997. However, the amended statute is not at issue in this case.

2. Subsection 78–12–25.5(4) provides:

 (4) Subject to Subsection (3), no action for breach of contract or warranty may be commenced against a provider more than six years after completion of the improvement or abandonment of construction. In the event the act, error, omission, or breach of duty is discovered in the sixth year of the six year period, the

injured person has two additional years from the date of discovery to commence an action.

3. Subsection 78–12–25.5(5) provides:

 (5) Subject to Subsections (3) and (4), no action may be commenced against a provider more than 12 years after completion of the improvement or abandonment of construction. In the event the act, error, omission, or breach of duty is discovered in the twelfth year of the 12–year period, the injured person shall have two additional years from the date of discovery to commence an action.

omission giving rise to the action is discovered or should have been discovered at any time prior to the six- and twelve-year periods, then the injured party only has two years in which to bring his claim. *See id.* § 78–12–25.5(3).[4]

■ ¶14 If the injured party discovers his cause of action before the respective six- and twelve-year periods have run, the statute acts as a statute of limitations. Statutes of limitation operate to preclude a cause of action after it has accrued and are "intended to compel the exercise of a right of action within a reasonable time and to suppress stale and fraudulent claims so that claims are advanced while evidence to rebut them is still fresh." *Horton v. Goldminer's Daughter*, 785 P.2d 1087, 1091 (Utah 1989). However, if the injured party does not discover (and reasonably could not have discovered) his cause of action until after the six- and twelve-year periods have run, then the statute acts as a statute of repose, cutting off the injured party's cause of action before it even arises. *See Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 672 (Utah 1985). In the present case, Craftsman's building was constructed in 1978 and its roof collapsed under the weight of snow fifteen years later in 1993; thus, the statute acts as a statute of repose and, if constitutional, bars Craftsman's causes of action.

■ ¶15 Craftsman argues that the builders statute of repose violates the open courts clause, which provides in part that "[a]ll courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law." Utah Const. art. I, § 11.[5] In *Berry*, we stated that the purpose of the open courts clause was to "impose some limitation" on the legislature's "great latitude in defining, changing, and modernizing the law." 717 P.2d at 676. To be consti-

tutional under the open courts clause, a statute that limits a right to a remedy for injury to person, property, or reputation must satisfy the following test set forth in *Berry:*

> First, section 11 is satisfied if the law provides an injured person an effective and reasonable alternative remedy "by due course of law" for vindication of his constitutional interest. The benefit provided by the substitute must be substantially equal in value or other benefit to the remedy abrogated in providing essentially comparable substantive protection to one's person, property, or reputation, although the form of the substitute remedy may be different. . . .
>
> Second, if there is no substitute or alternative remedy provided, abrogation of the remedy or cause of action may be justified only if there is a clear social or economic evil to be eliminated and the elimination of an existing legal remedy is not an arbitrary or unreasonable means for achieving the objective.

*Id.* at 680.

■ ¶16 According to defendants, the builders statute of repose satisfies both parts of the *Berry* test. First, defendants argue that the builders statute of repose provides an alternative remedy because it does not eliminate an action for breach of express warranty when there is an express warranty and the warranty period extends beyond six years. Subsection 78–12–25.5(6) provides in part, "Subsections (4) and (5) do not apply to an action against a provider . . . for breach of a written express warranty where the warranty period extends beyond six years as provided in Subsection (4)." However, the language of the statute does not purport to set up a substitute remedy; rather, it merely prescribes certain situations to which the periods of repose will not apply. Moreover,

---

4. Subsection 78–12–25.5(3) provides:

 (3) An action against a provider shall be commenced within two years from the date of discovery of the act, error, omission, or breach of duty or the date upon which the act, error, omission, or breach of duty should have been discovered through reasonable diligence. If the act, error, omission, or breach of duty is discovered or discoverable before completion of the improvement or abandonment of construction, the two year period begins to run upon completion or abandonment.

5. As the analytical framework of the majority opinion suggests, Justice Russon agrees with the interpretation of the open courts clause as set forth by Justice Stewart in his concurring opinion.

there is no guarantee that the provider will agree to warrant the improvement beyond six years; thus, the provision may provide no alternative whatsoever. In addition, the builders statute of repose applies to claims that accrue after April 29, 1991, even if the improvement was completed prior to that time. *See* Utah Code Ann. § 78–12–25.5(10). Hence, if the warranty provision was an alternative remedy, it would discriminate against those who entered into contracts prior to 1991 as they would have been unaware of the need to obtain an express warranty. We therefore hold that the builders statute of repose does not provide an adequate alternative remedy.

¶ 17 Second, defendants argue that the builders statute of repose eliminates clear social and economic evils in a reasonable and nonarbitrary manner. In enacting that statute, the legislature specifically found that exposing providers to liability after the possibility of injury has become highly remote is a clear social and economic evil in that it creates costs and hardships to providers and citizens of the state which include (1) liability insurance costs, (2) records storage costs, (3) undue and unlimited liability risks during the life of both a provider and an improvement, and (4) difficulties in defending against claims asserted many years after completion of an improvement. *See id.* § 78–12–25.5(2)(a), (b), & (c).[6] To remedy this perceived evil, the legislature enacted Utah Code Ann. § 78–12–25.5, which eliminates an injured party's remedy for injury to person or property arising out of an improvement to real property after a set number of years when the possibility of injury and damage becomes highly remote and unexpected.

¶ 18 In support of its argument that the builders statute of repose is unconstitutional, Craftsman cites *Horton v. Goldminer's Daughter*, 785 P.2d 1087 (Utah 1989), and *Sun Valley Water Beds v. Herm Hughes & Son, Inc.*, 782 P.2d 188 (Utah 1989), wherein we held Utah Code Ann. § 78–12–25.5 (1987), the prior version of the builders statute of repose, unconstitutional under the open courts clause. Craftsman argues that the legislature's stated findings do not describe clear social or economic evils and that, even if they did, the elimination of an injured party's remedy after the stated time periods is an arbitrary and unreasonable means in which to eliminate those evils. We disagree.

¶ 19 It is true that in *Horton* and *Sun Valley* we struck down the prior version of the builders statute of repose as violating the open courts clause. However, the statute of repose at issue in those cases was substantially different from the one before us now.[7] The prior statute eliminated all causes of action for injury due to defective design and construction seven years after completion of construction. Furthermore, in the prior statute, the legislature did not identify any social or economic evil. We were left to review what we considered the obvious: that the "purpose of the legislation [was] to end the potential threat of a lawsuit to some construction professionals." *Horton*, 785 P.2d at 1094. We acknowledged that while that may be a meritorious objective driven by a valid societal interest in providing a time of repose so as not to allow possible mistakes of the past to forever burden an individual, elimi-

---

6. Subsections 78–12–25.5(2)(a), (b), and (c) provide:

> (2) The Legislature finds that:
>
> (a) exposing a provider to suits and liability for acts, errors, omissions, or breach of duty after the possibility of injury or damage has become highly remote and unexpectedly [sic] creates costs and hardships to the provider and the citizens of the state;
>
> (b) these costs and hardships include liability insurance costs, records storage costs, undue and unlimited liability risks during the life of both a provider and an improvement, and difficulties in defending against claims many years after completion of an improvement;
>
> (c) these costs and hardships constitute clear social and economic evils.

7. The prior version of the builders statute of repose provided in pertinent part:

> No action to recover damages for any injury to property, real or personal, or for any injury to the person, or for bodily injury or wrongful death, arising out of the defective and unsafe condition of an improvement to real property, nor any action for damages sustained on account of such injury, shall be brought against any person performing or furnishing the design, planning, supervision of construction or construction of such improvement to real property more than seven years after the completion of construction.

Utah Code Ann. § 78–12–25.5 (1987).

nating this evil did not justify the elimination of the injured parties' remedies seven years after construction. *See id.* at 1094–95. We thus held the prior builders statute of repose unconstitutional. In so doing, we found it significant that the prior statute of repose was "too likely to cut off injuries that should be compensated." *Id.* at 1095. However, we specifically stated that the open courts clause does not "necessarily forbid[ ] forever and always all such forgiveness of mistake" and that "[w]hat it clearly does is make certain that periods of repose only be allowed when the possibility of injury and damage has become highly remote and unexpected." *Id.*

¶ 20 The builders statute of repose at issue in the present case lists the specific evils it desires to eliminate. Two of the stated evils concern costs to the construction industry: liability insurance costs and records storage costs. Absent a statute of repose, these costs would continue for the life of both the provider and the improvement. Such costs could be significant and would likely increase the cost of building, which undoubtedly would be passed on to consumers. This may very well adversely impact the state's economy by increasing the cost of living. The legislature also found that liability risk extending for the lifetime of a provider and an improvement constituted a social and economic evil. Many buildings in this state were constructed decades ago, and some are even older than a century. While some of the business entities responsible for such construction may still exist, the individual providers who assisted in the construction may have long since retired or passed away. The perpetual risk of liability to retired individuals or to businesses whose current owners had nothing to do with construction projects in the past undoubtedly creates a hardship to those involved. We have recognized such hardship and have stated that "[c]ertainly there is a valid social interest in providing a time of repose—in wiping the slate clean and not allowing possible mistakes of the past to becloud an individual's life forever"—and that "[t]he practice of wiping out past debts is an ancient one, rooted, indeed, in Old Testament times." *Horton,* 785 P.2d at 1095. We hold that the above

legislative concerns identify clear social and economic evils.

¶ 21 We now consider perhaps the more important inquiry of whether the builders statute of repose which eliminates an injured party's remedy under certain circumstances is a reasonable and nonarbitrary means to eliminate the stated evils. Craftsman argues that the builders statute of repose is arbitrary and unreasonable because it cuts off causes of action before they accrue and because the periods of repose apply to all kinds of improvements to real property without regard to their useful life. However, we have clearly stated that the open courts clause does not necessarily forbid all statutes of repose but that such statutes can be constitutional when the possibility of injury and damage is highly remote and unexpected. *Horton,* 785 P.2d at 1095. In the present case, the legislature specifically found that "the possibility of injury and damage becomes highly remote and unexpected as to claims for breach of contract or warranty six years following completion of the improvement or the abandonment of construction and, as to all other claims, ten years following completion or abandonment." Utah Code Ann. § 78–12–25.5(2)(d). While Craftsman asserts that the legislative findings merely parrot some of the statements we made in *Horton* and *Sun Valley,* it produces no evidence to suggest that the possibility of injury is not highly remote and unexpected after the six- and ten-year periods. In fact, Craftsman states in its brief that after twelve years, very few claims are brought. During debate of the bill in the House of Representatives, it was stated that the claims the builders statute of repose would cut off represented less than one percent of the claims brought. Further, in *Gibson v. West Virginia Department of Highways,* 185 W.Va. 214, 406 S.E.2d 440, 447 (1991), the court cited to a study which revealed that 99.6% of claims brought against architects or builders for design defects were brought within ten years. We conclude that less than a one percent chance of injury and damage is sufficiently remote to survive an open courts challenge.

¶ 22 The statute's reasonableness is further illustrated by the other provisions that recently have been added to the builders statute of repose. First, although the legislature found that injury or damage was highly remote after the periods of six and ten years, it chose a period of twelve years for all claims other than for breach of contract and warranty. Then it added a discovery provision which extends each respective period to as much as eight or fourteen years in the event the act or omission giving rise to the cause of action is discovered in the last year of each period. *See* Utah Code Ann. § 78–12–25.5(4) & (5). Second, the repose periods do not apply against a provider (1) who fraudulently conceals the act or omission giving rise to the cause of action, (2) whose act or omission is willful or intentional, or (3) where the parties have entered into an express written warranty and the warranty period extends beyond six years. *See id.* § 78–12–25.5(6). Third, minors or those who are mentally incompetent "have two years from the date the disability is removed to commence [their] action." *Id.* § 78–12–25.5(7). Finally, the time limitations do not apply "to any action against any person in actual possession or control of the improvement as owner, tenant, or otherwise, at the time any defective or unsafe condition of the improvement proximately causes the injury for which the action is brought." *Id.* § 78–12–25.5(8).

¶ 23 Given the above statutory provisions and the less than one percent chance of injury or damage, the builders statute of repose is not an arbitrary or unreasonable means to eliminate the stated evils. Therefore, we hold that Utah Code Ann. § 78–12–25.5 (1996), the builders statute of repose at issue in this case, is constitutional under the open courts clause of the Utah Constitution.

## II. DISCOVERY RULE AND REPOSE STATUTE

¶ 24 We now turn to the issue of whether the plain language of the statute subjects the repose periods to a discovery rule. The builders statute of repose provides in part:

(3) An action against a provider shall be commenced within two years from the date of discovery of the act, error, omission, or breach of duty or the date upon which the act, error, omission, or breach of duty should have been discovered through reasonable diligence.

(4) *Subject to Subsection (3),* no action for breach of contract or warranty may be commenced against a provider more than six years after completion of the improvement or abandonment of construction. In the event the act, error, omission, or breach of duty is discovered in the sixth year of the six year period, the injured person has two additional years from the date of discovery to commence an action.

(5) *Subject to Subsections (3) and (4),* no action may be commenced against a provider more than 12 years after completion of the improvement or abandonment of construction. In the event the act, error, omission, or breach of duty is discovered in the twelfth year of the 12–year period, the injured person shall have two additional years from the date of discovery to commence an action.

Utah Code Ann. § 78–12–25.5(3), (4), & (5) (emphasis added). Craftsman argues that the emphasized "subject to" language expresses the intent that the discovery rule in subsection (3) takes precedence over the repose periods in subsections (4) and (5) and effectively subjects the repose periods to a discovery rule. Thus, if an injured party meets the requirements of subsection (3) and commences his action within two years after discovery, then the repose periods do not apply. According to Craftsman, the result of such a construction would be that the repose periods would never be relevant in any given situation and thus the term "statute of repose" is a misnomer because the statute is effectively a statute of limitations requiring the injured party to bring his action within two years after discovery. We disagree with Craftsman's analysis.

¶ 25 When construing a statute, we seek to " 'give effect to the intent of the legislature in light of the purpose the statute was meant to achieve.' " *Mariemont Corp. v. White City Water Improvement Dist.,* 958 P.2d 222, 224 (Utah 1998) (quoting *Sullivan v. Scoular Grain Co. of Utah,* 853 P.2d 877, 880 (Utah 1993) (other citation omitted)).

" '[I]f doubt or uncertainty exists as to the meaning or application of an act's provisions, [we] analyze the act in its entirety and harmonize its provisions in accordance with the legislative intent and purpose.'" *Id.* at 225 (quoting *Beynon v. St. George–Dixie Lodge # 1743*, 854 P.2d 513, 518 (Utah 1993)).

 ¶ 26 When section 78–12–25.5 is viewed as a whole, its purpose and effect are clear. ·One of the legislature's stated findings is that "it is in the best interests of the citizens of the state to impose the periods of repose provided in this chapter." Utah Code Ann. § 78–12–25.5(2)(e). Subsections (4) and (5) go on to provide set time periods after which no action may be commenced. *Id.* § 78–12–25.5(4) & (5). Because these periods start to run on the date of completion or abandonment of the improvement without regard to the "occurrence of an injury that gives rise to a cause of action," they are statutes of repose. *Berry*, 717 P.2d at 672. Therefore, it is clear that section 78–12–25.5 was intended to include a statute of repose. In addition to the repose provisions, subsection (3) provides a statute of limitations which requires an action to be brought within two years after the cause of action is discovered or should have been discovered. Utah Code Ann. § 78–12–25.5(3).

 ¶ 27 The statute of limitations provision and the statute of repose provisions are not inconsistent. Although subsections (4) and (5) are "subject to" the statute of limitations provision, this simply means that if an injured party discovers (or should have discovered) his cause of action prior to the time of the running of the repose periods, then the applicable time period is the two-year limitations period and not the six- or twelve-year period of the statutes of repose. For example, if an injured party discovers a cause of action for negligence one year after completion of the improvement, then the injured party has only two years in which to commence his action, not eleven. Likewise, without the "subject to" language, a contract action discovered in the fifth year or a tort action discovered in the eleventh year would be barred after only one more year, i.e., after the respective six- or twelve-year period from completion of the improvement. However, the statute as written subjects such scenarios to subsection (3), and the injured party is provided two years to commence his action.[8] Therefore, the statute of repose provisions are not subject to a discovery rule but rather, in the present case, operate to bar Craftsman's causes of action.

## III. EXPRESS WARRANTY

 ¶ 28 We next discuss whether there was an express written warranty extending beyond six years. Section 78–12–25.5(6)(c) provides in part, "Subsections (4) and (5) do not apply to an action against a provider . . . for breach of a written express warranty where the warranty period extends beyond six years as provided in Subsection (4)." Craftsman argues that the references

---

8. In interpreting the statute to provide that persons discovering contract actions in the fifth year and all other actions in the eleventh year have less than two years to bring their action, Chief Justice Howe and Justice Zimmerman ignore fundamental rules of statutory construction. First, their interpretation creates the illogical result of allowing a party who discovers his action later (i.e., in the sixth or the twelfth year) a longer period of time in which to bring the action than a party who discovers his action earlier (i.e., in the fifth or the eleventh year). *See Alta Indus. Ltd. v. Hurst*, 846 P.2d 1282, 1292 n. 24 (Utah 1993) (stating that "statutes are interpreted to avoid absurd results" (citation omitted)); *Nelson v. Stoker*, 669 P.2d 390, 396 (Utah 1983) (stating that "we will not interpret a statute in such a way that results in an absurdity" (citations omitted)). There is simply no rational basis to allow a person two years to file an action if it is discovered in the sixth or the twelfth year and deny the same two-year period to a person who discovers his action in the fifth or the eleventh year. The cases cited by Chief Justice Howe are inapposite as neither case involves similar inconsistencies. Second, to justify his interpretation, Chief Justice Howe substitutes the word "notwithstanding" for the phrase "subject to," despite their obviously conflicting meanings. In so doing, he contradicts the cardinal rule that "courts are not to infer substantive terms into the text that are not already there. Rather, the interpretation must be based on the language used, and the court has no power to rewrite the statute to conform to an intention not expressed." *Berrett v. Purser & Edwards*, 876 P.2d 367, 370 (Utah 1994). While the statute is indeed confusing, the only reasonable and rational interpretation is that if an action is discovered prior to the end of the respective six- or twelve-year period, a party has two years from that discovery to commence his action; otherwise it is barred.

to "a live load of 40" and "40# psf LL" in the buildings specifications—meaning that the roof of the building would support 40 pounds per square foot—created an express warranty that extended to future performance. Craftsman asserts that, at a minimum, a question of fact exists as to whether this warranty extended beyond six years. However, assuming the above language constitutes a warranty, Craftsman points to no evidence of a warranty period, let alone one that extends beyond six years. Without such evidence, Craftsman cannot satisfy section 78–12–25.5(6)(c), which requires a "written express warranty where the warranty period extends beyond six years." While Craftsman argues that it "defies logic to argue that [the] building was warranted to bear a 40 lb. load, but not in the future," we decline to let the warranty period issue go to a jury for purposes of section 78–12–25.5(6)(c), where such a period was not expressed by the parties and there is no other evidence that the warranty extended beyond six years.

## IV. BUILDERS STATUTE OF REPOSE

¶ 29 The final issue we address is whether the products liability statute of limitations should apply instead of the builders statute of repose because it is the more specific statute. The products liability statute of limitations bars an action two years after the injured party discovers or should have discovered the harm and its cause. *See* Utah Code Ann. § 78–15–3. It is undisputed that Craftsman filed its products liability claim within the limitation period.

¶ 30 In support of its argument, Craftsman cites the following language from *Jensen v. IHC Hospitals, Inc.*, 944 P.2d 327, 336 (Utah 1997):

[W]hen faced with two statutes that purport to cover the same subject, our primary duty "is to determine legislative intent, and the best evidence of legislative intent is the plain language of the statute." A settled rule of statutory construction, which helps us determine the legislative intent, provides that "a more specific statute governs instead of a more general statute."

(Citations omitted.) Craftsman asks us to hold that the products liability statute of limitations governs this case because it is more specific than the builders statute of repose. According to Craftsman, the products liability statute is more specific because it applies only to products, whereas the builders statute of repose is much broader, applying, in the words of Craftsman, to "all causes of action against any entity that took any part in the construction of any improvement to any real property." However, as the quote cited by Craftsman makes clear, our goal is determining the legislative intent, and the best evidence of legislative intent is the statute's plain language. In the present case, the legislative intent is clear from the statute's plain language. Section 78–12–25.5(1)(a) states, "As used in this section: (a) 'action' means any claim for judicial, arbitral, or administrative relief for acts, errors, omissions, or breach of duty that causes injury to persons or property, *whether based in tort,* contract, warranty, *strict liability,* indemnity, contribution, or other source of law." (Emphasis added.) The legislature clearly intended the builders statute of repose to apply to products liability actions when they relate to improvements in real property. When the intent is clear from the plain language of the statute, we need not go beyond that language.

## CONCLUSION

¶ 31 We affirm the summary judgment in favor of U.S. Construction and Butler Manufacturing. The builders statute of repose, Utah Code Ann. § 78–12–25.5 (1996), is constitutional under article I, section 11 of the Utah Constitution. The repose periods are not "subject to" a discovery rule, and there is no evidence of any warranty extending beyond six years that would except Craftsman's express warranty claim. Further, the builders statute of repose applies to bar Craftsman's products liability claim.

STEWART, Justice, concurring:

¶ 32 I concur with Justice Russon's carefully and correctly reasoned majority opinion. I write not because I believe it necessary to add anything thereto, but rather to respond

to Justice Zimmerman's lone concurrence in which he attacks long-standing Utah case law construing Article I, section 11 of the Utah Constitution, the so-called open courts provision.[1] Justice Zimmerman aims much of his attack at *Berry v. Beech Aircraft Corp.*, 717 P.2d 670 (Utah 1985); however, the attack on *Berry* serves as a guise to nullify this Court's Article I, section 11 jurisprudence and, more importantly, the Framers' very purpose and intent in adopting the remedy clause in the Utah Declaration of Rights. He would reverse Utah case law that has existed for over fifty years and nullify the most important clause—the remedies clause—in Article I, section 11. Justice Zimmerman's current opinion is in stark contrast to his prior consistent positions in numerous opinions sustaining and applying *Berry* and giving effect to Article I, section 11 and its plain meaning. Simply stated, his current position would deny citizens of this state the constitutional right secured by the Framers to a remedy by due course of law for an injury to their persons, property, or reputations.

## I. INTRODUCTION

¶ 33 In all, thirty-eight states have open courts provisions in their constitutions. *See* David Schuman, *The Right to a Remedy*, 65 Temp. L.Rev. 1197, 1201 & n. 25 (1992). A few of them guarantee only procedural access to the courts, but most, like Utah's, also impose some substantive limitation on the power of the legislature to abolish judicial remedies in a capricious fashion. Indeed, one state, New Mexico, has recognized an implicit substantive constitutional right to a remedy in its state constitution, even though its constitution has no specific provision, such as Article I, section 11, to that effect. *See id.* (citing *Richardson v. Carnegie Library Res-*

*taurant, Inc.*, 107 N.M. 688, 763 P.2d 1153, 1161 (1988)). After reviewing the law from other states, Professor Schuman has stated that most courts "interpret the remedy guarantee to proscribe some legislation affecting remedies without completely restraining lawmakers." *Id.* at 1208. All courts, however, appear to recognize that "lawmakers cannot deprive plaintiffs of vested rights." *Id.*

¶ 34 The primary origin of the rights protected by Article I, section 11 and the open courts provisions in most other state constitutions is the Magna Carta.[2] Nevertheless, the adoption of open courts provisions by the various states has been influenced to some extent by conditions threatening those rights at the time the various constitutional provisions were adopted.

¶ 35 The provision in the Magna Carta that is the genesis of American open courts provisions was directed at King John's corruption of the English courts. At the time of the American Revolution, when the first state constitutions were drafted, the evil aimed at was the closing of American colonial civil courts by the English for the purpose of denying civil remedies to the colonists. However,

> [b]y the last quarter of the eighteenth century, during which the American remedy guarantees first appeared, the focus of popular distrust had shifted from the King's courts to the people's representatives. After an unsuccessful early period during which state constitutions contained expansive grants of authority to the legislative branch, the people, disillusioned by what they perceived as legislative corruption (capture by private interest), enacted a "second wave" of state constitutions

---

1. Article I, section 11 states:
 All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, which shall be administered without denial or unnecessary delay; and no person shall be barred from prosecuting or defending before any tribunal in this State, by himself or counsel, any civil cause to which he is a party.

2. *See infra* part II. In the Magna Carta, King John promised: "To no one will we sell, to no

one will we refuse or delay, right or justice." Schuman, 65 Temp. L.Rev. at 1199 (internal quotes omitted). Lord Coke later wrote an influential commentary on Magna Carta and explained this phrase as follows: "Every Subject of this Realm, for injury done to him in goods, land or person, . . . may take his remedy by the course of the Law, and have justice and right for the injury done him, freely without sale, fully without any denial, and speedily without delay." *Id.* (internal quotes and alterations omitted).

stripping legislatures of many of their prerogatives and vesting increased power in the judiciary.... [A]t the time that many modern American remedy guarantees themselves, or their direct predecessors, were brought into existence, the evil was renegade legislatures that had, for example, deprived injured creditors of their judicial remedies against debtors by passing legislation impairing existing contractual obligations.

*Id.* at 1200–01.

¶ 36 Open courts provisions have served two principal purposes. First, they were intended to help establish an independent foundation for the judiciary as an institution. *See* Jonathan M. Hoffman, *By the Course of the Law: The Origins of the Open Courts Clause of State Constitutions,* 74 Or. L.Rev. 1279 (1995); *Industrial Comm'n v. Evans,* 52 Utah 394, 174 P. 825, 831 (1918) ("[T]he question of ultimate legal liability cannot be withdrawn from the courts."). Second, open courts or remedies clauses were intended to grant individuals rights to a judicial remedy for the protection of their person, property, or reputation from abrogation and unreasonable limitation by economic interests that could control state legislatures. *See* Schuman, 65 Temp. L.Rev. at 1208; *Berry,* 717 P.2d at 675.

¶ 37 Justice Zimmerman's opinion totally ignores the history and purposes of open courts provisions, and therefore, he does not even purport to construe Article I, section 11 in light of its purpose and history. Although he purports to analyze the language of section 11, he in fact abandons the plain meaning of the language of that provision in favor of a skewed interpretation that nullifies its most important purpose. The result would undermine a foundation stone of the judiciary and the right that a citizen has to a judicial remedy to protect one's person, property, and reputation by broadening the power of special interests to misuse legislative power at the expense of the rights of the citizens.

¶ 38 In addition, Justice Zimmerman's position flouts the doctrine of stare decisis. He would overrule fifty years of unanimous Utah legal precedent from *Masich v. United States Smelting, Refining & Mining Co.,* 113 Utah 101, 191 P.2d 612 (1948), to *Hirpa v. IHC Hospitals, Inc.,* 948 P.2d 785 (Utah 1997), a case decided by a unanimous court barely one year ago. Some thirteen justices of this Court who have decided the long line of cases from *Masich* in 1948 to *Hirpa* in 1997, including Justice Zimmerman, have concurred in the plain meaning construction of Article I, section 11. This line of Utah cases is consistent with the rulings of the vast majority of courts from other states construing similar constitutional provisions.

¶ 39 Justice Zimmerman argues that the test adopted in *Berry* for determining how section 11 should be applied in cases challenging the constitutionality of a statute in effect "constitutionalizes" the common law and elevates it over statutory law. *See* ¶ 122. His assertion is simply incorrect; it is flatly contrary to the express language and holding of *Berry* and numerous other Utah cases decided under Article I, section 11. Although he claims that the *Berry* test is unduly restrictive of legislative power, the fact is that the test is no more restrictive of legislative power than the orthodox standard for applying the due process clause with respect to legislative power. No one today asserts that the due process clause of our constitution should be abandoned because it unduly restricts legislative power.

¶ 40 Although *Ross v. Schackel,* 920 P.2d 1159 (Utah 1996), which decided the issue of the immunity of a prison doctor for medical malpractice committed on a prisoner, was decided in part on the basis of whether a cause of action against such an official was recognized by the common law when the Utah Constitution was adopted, that analysis was not dictated by *Berry;* indeed, *Ross* simply did not employ the *Berry* analysis at all in resolving the immunity issue.[3] While the common law is not wholly irrelevant to a proper construction of section 11,[4] the *Ross*

---

3. The opinion in *Hirpa* partially reflects the historical approach that Justice Howe took in *Ross,* but *Hirpa,* unlike *Ross,* applied the *Berry* test in

sustaining the constitutionality of a Good Samaritan statute.

4. Clearly, the state of the law in 1896 has some bearing on the Framers' intent in adopting vari-

opinion is aberrant in suggesting that the right to a remedy is defined by the common law as it existed in 1896.

## II. ORIGINS AND PURPOSE OF ARTICLE I, SECTION 11 RIGHTS

¶ 41 The Framers of the Utah Constitution included Article I, section 11 to anchor in the Constitution rights that originated in the English Magna Carta of 1215 and that are among those essential to a peaceful society. The purpose of those rights is to bar sovereign power, whether kingly, parliamentary, or legislative, from undermining an independent judiciary and arbitrarily abolishing remedies that protect the person, property, or reputation of each individual.[5] The rights Article I, section 11 protects are not ephemeral or time-bound rights; they are today as important to a just and peaceful society as they have been historically. Their origins go back further in history than any other provision in the Utah Declaration of Rights or, indeed, in the Bill of Rights of the United States Constitution,

except for those rights protected by the due process clause.[6] Those rights became the basis for important principles of English jurisprudence as developed by Lord Coke in the 17th century[7] and Sir William Blackstone in the 18th century. Their work had a far-reaching effect in the framing of American state constitutions. *See* William C. Koch, Jr., *Reopening Tennessee's Open Court's Clause: A Historical Reconsideration of Article I, Section 17 of the Tennessee Constitution,* 27 Memphis St. L.Rev. 333, 357–64 (1997) [hereinafter *Tennessee's Open Court's Clause* ].

¶ 42 One of the abuses that gave rise to the Magna Carta was the King's practice of conditioning the right to a royal writ, and thus the right to a remedy from the King's Court, on the payment of a fee. The arbitrary granting and withholding of royal writs by the King made the judicial protection of goods, property, person, and reputation problematic and capricious.

¶ 43 In describing Lord Coke's analysis of Chapter 29 of the 1225 Magna Carta,[8] Koch stated:

ous constitutional provisions. For example, this Court has held that the doctrine of sovereign immunity, as a general proposition, could bar remedies against government agencies notwithstanding Article I, section 11. *See DeBry v. Noble,* 889 P.2d 428 (Utah 1995); *Madsen v. Borthick,* 658 P.2d 627 (Utah 1983). That, however, does not mean that the law in 1896 was constitutionalized or that a court should decide an Article I, section 11 case on the basis of whether a particular set of facts gave rise to a "cause of action," as the Utah Court of Appeals did in *Day v. State,* 882 P.2d 1150 (Ct.App.1994), *cert. granted,* 892 P.2d 13 (Utah 1995).

5. The remedy clause of section 11 is not duplicative of the due process clause, although the latter clause has been used in some jurisdictions that have no remedy clause where a remedy clause would more appropriately be used. In giving constitutional protection to the values of *"person, property,* or *reputation,"* section 11 differs from the due process clause, which protects *"life, liberty,* and *property."* Utah Const. art. I, § 7. Section 11 is concerned with the availability of remedies to vindicate "civil" injuries inflicted by one individual on another's vital interests. The due process clause is directed more to arbitrary government action and government's relationship to individuals. Nor is section 11 duplicative of the "uniform operation of the laws" provision in section 24, which is concerned that laws enacted by the Legislature should not discriminate

between persons similarly situated. *See Malan v. Lewis,* 693 P.2d 661, 669 (Utah 1984).

6. The right of self-representation that is also contained in section 11 is, of course, of more modern origin than the right of access to the courts and the corollary right to a remedy.

7. *See* Coke's Second Institute, *discussed in Hastings, Lyon & Herman Block, Edward Coke, Oracle of the Law* 346–48 (1929).

8. The 1225 Magna Carta was a reissuance by King Henry III of King John's 1215 Magna Carta. *See Tennessee's Open Court's Clause* at 353– 57. The latter authority states:

While the evolution of Magna Carta's language ended in 1225, the evolution and growth of its significance has continued through the centuries into the present time. Magna Carta was the first manifestation of the fundamental principle that both the governor and the governed are subject to the rule of law. Its history has been one of reinterpretation, and thus its importance lies not in the literal intent of the men at Runnymede but rather in the meaning that future generations have read into its words. Over the centuries, Chapters 39 and 40 of King John's Charter and Chapter 29 of the Magna Carta of 1225 have evolved into two of the most dominant themes in Anglo–Ameri-

The discussion of Chapter 29 also provided Lord Coke with the opportunity to explain the significance of the common law and the importance of individual rights. He viewed the common law as the "surest sanctuary, that a man can take, and the strongest fortresse to protect the weakest of all." *For Lord Coke, the common law was the right of everyone to have their goods, lands, families, body, life, and honor protected from injury and wrong.* In his concluding observation of Chapter 29's importance, Lord Coke stated: "As the goldfiner will not out of the dust, threds, or shreds of gold, let passe the least crum, in respect of the excellency of the metall: so ought not the learned reader to let passe any syllable of this law, in respect of the excellency of the matter."

*Id.* at 360 (emphasis added) (footnotes omitted).

¶ 44 Blackstone asserted that the rights of Englishmen had little value but for Magna Carta's guarantee of the right of access to the courts. With respect to that right and the right to a remedy for civil wrongs, Blackstone stated:

"A third subordinate right of every Englishman is that of applying to the courts of justice for redress of injuries. Since the law is in England, the supreme arbiter of every man's life, liberty, and property, courts of justice must at all times be open to the subject, and the law be duly administered therein. The emphatical words of *magna carta* spoken in the person of the King, who in judgment of law (says sir Edward Coke) is ever present and repeating them in all his courts, are these: nulli vendemus, nulli negabimus, aut differemus restum vel justitiam: *'and therefore every subject,'* continues the same learned author, *'for injury done to him in bonis [i.e., goods] in terris [land] vel persona [per-*

son] by any other subject, be he ecclesiastical or temporal, without any exception, may take his remedy by the course of law, and have justice and right for the injury done him,* freely without sale, fully without any denial, and speedily without delay.'"

*Tennessee's Open Court's Clause* at 363 (emphasis added) (quoting 1 William Blackstone, *Commentaries* *141).

¶ 45 Commencing with the outbreak of the American Revolutionary War, the new states, which had been colonies of England, adopted constitutions. Beginning with the adoption of the Constitution of Virginia on June 29, 1776, eleven of the original thirteen states adopted new constitutions, and six of the eleven constitutions contained "open courts" or "right to remedy" provisions rooted in Chapter 40 of King John's Magna Carta and Chapter 29 of the 1225 Magna Carta. *See id.* at 367. Section XII of the Delaware Declaration of Rights of 1776 was typical. It stated:

That every Freeman for every Injury done him in his Goods, Lands or Person, by any other Person, ought to have Remedy by the Course of the Law of the Land, and ought to have Justice and Right for the Injury done to him freely without Sale, fully without any Denial, and speedily without Delay, according to the Law of the Land.

*Id.* at 367.

¶ 46 The rights protected by those provisions included more than just a right to enter the courthouse. The substantive rights to be protected by the "remedy clauses" was implicitly recognized in several of the early state constitutions, as evidenced by the fact that the law of sovereign immunity was stated to be an exception to the rights protected by the remedy clauses in open courts provisions.[9] For example, the open

---

can jurisprudence—the principles of due process of law and the universal guarantee of equal justice for all.
*Id.* at 356–57 (footnotes omitted).

9. In referring to substantive rights protected by the remedy clause of Article I, section 11, I do not mean particular "causes of action" in any technical sense. The term "substantive" when referring to section 11 rights means a right to a

"remedy by due course of law." I note that the law of remedies is sometimes referred to as "procedural" law, as opposed to "substantive law," which defines the rights and liabilities that are given legal effect in the form of causes of action or claims for relief. Looking past the terms of art "substantive" and "procedural," the critical difference between Justice Zimmerman and me is that in my view, the language in Article I, section 11 giving "every person" a right to a

courts provision in Article IX, section 11 of the Pennsylvania Constitution of 1790 included a sentence specifically providing the legislature with the power to determine when and how suits could be maintained against the commonwealth:

> That all courts shall be open, and every man, for an injury done him in his lands, goods, person, or reputation shall have remedy by the due course of law, and right and justice administered without sale, denial, or delay. *Suits may be brought against the commonwealth in such manner, and in such courts, and in such cases as the legislature may by law direct.*

*Id.* at 368 n. 220 (emphasis added).

¶ 47 An open courts, or guaranteed remedy, provision was not contained in the United States Constitution or in the federal Bill of Rights, no doubt because the law governing rights, duties, and liabilities between individuals with respect to the protection of "person, property, or reputation" was deemed to be committed or reserved exclusively to the states. *See generally id.* at 368–75. While there is, of course, some overlap in the rights guaranteed by open courts provisions and other constitutional provisions, such as due process and equal protection, that overlap is not unique to open courts provisions and does not lessen their importance as basic constitutional protections. There is, for example, some overlap between the equal protection, due process, and privilege and immunities clauses of both state and federal constitutions, but no one of those clauses is wholly duplicative of the other, and each fills a specific constitutional need.

¶ 48 Indeed, the United States Supreme Court recently observed with respect to the Texas open courts provision, which is similar to open courts provisions in Utah and a number of other states, that it provided broader constitutional protections than those afforded by the Due Process Clause of the Fourteenth Amendment. The Supreme Court in *Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1, 12 n. 11, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987), quoted *LeCroy v. Hanlon,* 713 S.W.2d 335, 340–41 (Tex.1986), which stated:

> The open courts provision must have been intended to provide rights in addition to those in the due process provision or the former would be surplusage. Furthermore, the due process provision's general guarantees contrast with the open courts provision's specific guarantee of a right of access to the courts.

*See also Tennessee's Open Courts Clause* at 341 n. 26.

¶ 49 It is true that some states have adopted open courts clauses that, unlike Utah's, protect only the procedural rights of access to the courthouse and a speedy administration of judicial proceedings. But if the Framers of the Utah Constitution had intended to adopt such a limited guarantee, as Justice Zimmerman now says is all that section 11 does, the Framers had models that they could have copied. *Cf., e.g.,* Mont. Const. art. II, § 16; Wash. Const. art. I, § 10 ("Justice in all cases shall be administered openly, and without unnecessary delay."). Obviously, they did not intend to so limit the rights guaranteed to the citizens of Utah.

¶ 50 Because of political abuses that existed in a number of states at the end of the 19th century when the Utah Constitution was framed, the Framers, relying on legal principles that were centuries old, included constitutional protections against such evils. The abuses included the misuse of political influence by railroads and other corporate interests to elevate their self-interests over the public interest by obtaining from state legislatures privileges and immunities that insulated them from the general laws. For reference to the origin of open courts provisions and the industrial history of certain states around the turn of the century, see *Perkins v. Northeastern Log Homes,* 808 S.W.2d 809, 811–12 (Ky.1991), and *Kenyon v. Hammer,* 142 Ariz. 69, 688 P.2d 961, 971–73 n. 9 (1984).

¶ 51 The history of the framing of the Arizona Constitution reflected conditions that

---

"remedy by due course of law" for injuries to one's "person, property, or reputation" is an enforceable constitutional limitation on the power of the Legislature to abrogate legal remedies. Justice Zimmerman finds no such limitation.

existed around the turn of the century. As one commentator explained:

> The history of the Arizona Constitutional Convention reveals the broad protection that the framers intended with the anti-abrogation provisions. The Arizona Constitution was drafted during the "high-water mark" of the progressive movement. The progressives did not trust big corporations. The powerful industries during that time were the railroad and mining corporations. These corporations were notorious for political domination and corruption.
>
> The progressive movement allied itself with prolabor interests. Together, the progressive and labor interests set out to protect individuals from big business by regulating corporations and by curbing the substantive power of the legislature. This "tenacious" alliance influenced the Arizona Constitution. Ultimately, the convention approved a number of provisions that favored individuals over business, including the anti-abrogation provisions.

Johnny J. Sorensen, Comment, *Adios Statute of Repose: A Temporary Aberration in Constitutional Interpretation*, 26 Ariz. St. L.J. 1101, 1107–08 (1994) (footnotes omitted).

¶ 52 The law that had developed under Chapter 29 of the Magna Carta, according to Coke and Blackstone, provided the means for dealing with such abuses. *See generally Tennessee's Open Court Clause* at 358–63. Arizona, for example, adopted Article XVIII, section 6 as part of its constitution, the strongest of all such state constitutional provisions, not only to protect the right of citizens to a legal remedy for injuries inflicted, but also to protect specific "rights of actions" to recover damages. Article XVIII, section 6 of the Arizona Constitution states, "The right of action to recover damages for injury shall never be abrogated, and the amount recovered shall not be subject to any statutory limitation." For an explanation of related purposes underlying Article I, section 11 of the Utah Constitution, see *Berry*, 717 P.2d at 674–81, and Justice Zimmerman's lengthy and accurate explanation in *Condemarin v. University Hospital*, 775 P.2d 348, 366, 367 (Utah 1989) (Zimmerman, J., concurring).

¶ 53 Article I, section 11 of the Utah Constitution is much more flexible and much less restrictive of legislative power than the Arizona provision. Section 11 protects a citizen's right to a remedy rather than causes of action as such, but the abuses that gave rise to the Arizona provision no doubt influenced the Utah Framers. It is significant that the labor article in the Utah Constitution, Article XVI, section 5, gave constitutional protection, as does Arizona's constitution, to wrongful death "causes of action" and provides that the amount that can be recovered in damages cannot be limited by statute. Article XVI, section 5 of the Utah Constitution (as later amended to accommodate the Workers' Compensation Act) states:

> The right of action to recover damages for injuries resulting in death, shall never be abrogated, and the amount recoverable shall not be subject to any statutory limitation, except in cases where compensation for injuries resulting in death is provided for by law.

Although the remedies clause in Article I, section 11 does not protect particular causes of action, it does safeguard *remedies* necessary to protect the interests of person, property, and reputation from arbitrary abrogation, as *Evans*, 52 Utah 394, 174 P. 825 (1918), *Masich, Berry, Horton v. Goldminer's Daughter*, 785 P.2d 1087 (Utah 1989), and *Sun Valley Water Beds v. Herm Hughes & Son, Inc.*, 782 P.2d 188 (Utah 1989), show.

¶ 54 Justice Zimmerman asserts that history supports the view that the Framers of the Utah Constitution did not intend the constitutionalization of the common law by the language adopted in Article I, section 11.[10] That of course is correct, but his history is not. Justice Zimmerman's statement

---

10. He contends:
 Interpreting the open courts provision to contain substantive protection of particular causes of action, thereby constitutionalizing the common law, is made absurd by the fact that Utah is a state that has a history, prior to statehood,

that Utah "abjur[ed] the common law entirely," ¶ 144, is far from an accurate assessment of Utah history.[11] To deny, as Justice Zimmerman does, that the common law was a fundamental part of the law that governed the Utah Territory is revisionist history wholly detached from the most cursory reading of the history of the Territory. *See, e.g., Thomas v. Union Pac. R.R.*, 1 Utah 232, 234 (1875); *First Nat'l Bank v. Kinner*, 1 Utah 100, 107 (1873); *People v. Green*, 1 Utah 11, 13–14. The warp and the woof of the law in the Territory was the common law. The volumes of the Supreme Court Reports for the Territory of Utah are replete with the application of common law principles in all kinds of property, personal injury, and contract cases, as well as on procedural issues. Indeed, various provisions of the Utah Declaration of Rights cannot be understood without reference to the common law and the history of Anglo–American law. For example, the provisions in the Declaration of Rights with respect to the right of free speech, the privilege against self-incrimination, the right to jury trial, etc., are all rooted in, and grew out of, the common law heritage that defines the scope and meaning of many provisions in both the Utah and the United States Constitutions. Indeed, this Court has often resorted to the common law in construing various provisions in the Utah Declaration of Rights. *See, e.g., Jensen v. State Tax Comm'n*, 835 P.2d 965 (Utah 1992); *American Fork City v. Crosgrove*, 701 P.2d 1069 (Utah 1985).

### III. THE PLAIN MEANING OF ARTICLE I, SECTION 11

¶ 55 The preeminent obligation of judges in constitutional adjudication is to give force to constitutional provisions intended to protect the rights of the people against intrusions by majorities and overreaching special interests who misuse legislative powers to advance their private self-interests at the expense of the liberties of the people. The meaning of the constitutional provisions that judges are under oath to apply is found first and foremost in the plain meaning of the constitutional language.

#### A. The Plain Language of the Remedy Clause of Section 11

¶ 56 Plainly put, Justice Zimmerman would rewrite the plain language of section 11. He asserts that "a thorough parsing of article I, section 11 demonstrates to me that *Berry* incorrectly concluded that the open courts provision provides very specific substantive limitations on the legislature."[12] ¶ 120. The answer to his assertion that section 11 establishes only a procedural right of

---

of abjuring the common law entirely. This interpretation is also inconsistent with our pre-*Berry* case law, which, as I noted above, focused on the procedural guarantee of the open courts provision. Given the inconsistency of *Berry*'s interpretation of the open courts provision with this history, a substantive interpretation is cast into even greater doubt because of the tension it creates under the separation of powers doctrine of article V, section 1 of the Utah Constitution. ¶ 144.

11. Justice Zimmerman relies entirely on an 1855 territorial law to support that extraordinary assertion. *See* Laws, Territory of Utah 260 ch. LXIV, 1 (1855). That provision was enacted a mere eight years after Brigham Young and the first group of Mormon pioneers entered the Salt Lake Valley. Asserting that this provision, enacted forty years before the Constitutional Convention drafted the Utah Constitution, reflects the history of Utah law is farfetched. In 1898, the Legislature formally adopted the common law as the governing law in the state insofar as it did not conflict with statutory or constitutional law. *See* Rev. Stat. Utah 1898 ¶ 2488.

12. The term "substantive" in the present context means a limitation on legislative power to deny enforcement of substantive rights by abrogating judicial remedies. In another sense of the substantive-procedural dichotomy, it could be said that all the clauses in section 11 are "substantive" limitations on the legislative prerogative. *Cf. Evans*, 52 Utah 394, 174 P. 825. However, to speak of a "substantive" limitation on the power of the Legislature does not mean that the Legislature cannot change or modify the *substantive law* of rights, liabilities, and remedies. The substantive limitation on legislative power prohibits the Legislature from arbitrarily abrogating remedies to enforce those rights and liabilities. It should be noted, however, that the law of remedies is sometimes called "procedural" law and sometimes called "substantive" law.

access to the courts is the plain language of Article I, section 11 itself. Section 11 states:

[1] All courts shall be open, [2] and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, [3] which shall be administered without denial or unnecessary delay; and [4] no person shall be barred from prosecuting or defending before any tribunal in this State, by himself or counsel, any civil cause to which he is a party.

¶ 57 For ease of reference, bracketed numbers have been inserted at the beginning of each separate clause in section 11. Section 11 contains four clauses. Clauses 1, 3, and 4 deal with procedural rights prescribing how courts and judicial proceedings should be administered. Clause 2, the remedy clause, establishes the right of a person injured "in his person, property or reputation" to a judicial remedy to redress those injuries.

¶ 58 Clause 1 states that "all courts shall be open." Clause 2 states that "every person, for an injury done to him in his person, property or reputation shall have remedy by due course of law." Clause 3 states that all judicial proceedings "shall be administered without denial or unnecessary delay." Clause 4 establishes the right of self-representation in civil cases. Each of these clauses in section 11 has been held to bind the Legislature. *See Jensen v. State Tax Comm'n*, 835 P.2d 965 (Utah 1992); *Berry*, 717 P.2d 670; *Celebrity Club, Inc. v. Liquor Control Comm'n*, 657 P.2d 1293 (1982); *Nelson v. Smith*, 107 Utah 382, 154 P.2d 634 (1944); *Evans*, 52 Utah 394, 174 P. 825.

¶ 59 Section 11 mandates not only that the courthouse door be open to all litigants, but also that, once inside the courthouse, litigants are entitled to a remedy "by due course of law" for legal injuries. Thus, to make the right of access to the courthouse more than an empty gesture, clause 2 mandates that *"every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law."* Clause 2 could not be more clear. The lan-

guage that *"every person" "shall have remedy"* that shall be *"by due course of law"* is as specific, clear, and mandatory as the English language can be. Clause 2, unlike the other three clauses, does not deal with procedural requirements pertaining to judicial proceedings. Rather, clause 2 imposes the "substantive" requirement that one who is harmed in person, property or reputation shall have the right to a "remedy by due course of law."

¶ 60 In flat contradiction to the clear meaning of the above language, Justice Zimmerman argues that the remedy clause does not provide that a person injured in person, property, or reputation shall have a remedy, but that this language means only that remedies should be administered expeditiously. *See* ¶ 148. Thus, according to him, the Legislature has wholly unrestrained power to abrogate any and all remedies that would redress injuries to one's person, property, and reputation. He correctly states that the remedy clause does not merely state that a person "shall have remedy" and that the remedy shall be "by due course of law," but then illogically jumps to the non sequitur that "the remedy guarantee" is thus cast "in a procedural light." ¶ 148. That conclusion is ungrammatical; it makes no sense to say that the substantive right to a remedy is procedural only because it is to be administered without "unnecessary delay." Thus, Justice Zimmerman's purported "parsing" of the language in section 11 is both ungrammatical and flatly contrary to its plain meaning. As stated, the phrase that a remedy shall be by "due course of law" does not change the declarative language that a person shall have a remedy for an injury to person, property, or reputation. The "due course of law" requirement simply means that a remedy shall be administered by established legal procedures. Justice Zimmerman also argues that the clause "which shall be administered without denial or unnecessary delay" reinforces a procedural emphasis. ¶ 148. But that adverbial clause does not change in the least the meaning of the preceding phrase that *"every person for an inju-*

*ry done to him* shall have *remedy by due course of law.*" The latter clause is an independent, declarative clause that creates a right to a remedy, and the language that the remedy "shall be administered without denial or unnecessary delay" merely describes how the right to a remedy should be administered.

¶ 61 Justice Zimmerman's "parsing" of the language is nothing more than a play on words that seeks to obscure the plain meaning of the remedy clause so as to nullify its meaning and effectively erase that clause from the Constitution. As he rewrites section 11, it would read:

> All courts shall be open [and all proceedings] shall be administered without denial or unnecessary delay; and no person shall be barred from prosecuting or defending before any tribunal. . . .

¶ 62 When judicial restraint evaporates to such an extraordinary degree that a provision of the Constitution can be nullified by a judicial rewriting of it, no provision in the Constitution is safe from the personal predilections of judges, and the whole foundation of constitutional restraint of governmental power is imperiled. There is no legally legitimate justification for substituting a judge's personal view of what the law should be for what the people of Utah, through their Constitution, have stated the law shall be.

¶ 63 Justice Zimmerman's rewriting of clause 2 also violates Article I, section 26 of the Declaration of Rights, which states, "The provisions of this Constitution are mandatory and prohibitory unless by express words they are declared to be otherwise." There is nothing in any of the language of section 11 that declares it to be other than mandatory and prohibitory. Section 26 "rivets section 11, and all the other rights in the Declaration of Rights, into the fundamental law of the state and makes them enforceable in a court of law." *Berry,* 717 P.2d at 676.

### B. *Utah Case Law*

¶ 64 In an apparent attempt to show that *Berry* constituted a break with prior law,

Justice Zimmerman states that *Berry* was the first Utah case to recognize that section 11 limits the power of the Legislature to abrogate remedies. *See* ¶ 112. That is totally incorrect. In 1948, this Court decided *Masich v. United States Smelting, Refining & Mining Co.,* 113 Utah 101, 191 P.2d 612 (1948), which clearly recognized that section 11 places some reasonable limitation on the power of the Legislature to abolish remedies. I discuss *Masich* at length *infra* but now simply note that, in harmony with *Masich, Berry* restated the plain meaning of section 11:

> Section 11 protects remedies by due course of law for injuries done to the substantive interests of person, property, and reputation. *What section 11 is primarily concerned with is not particular, identifiable causes of action as such, but with the availability of legal remedies for vindicating the great interest that individuals in a civilized society have in the integrity of their persons, property, and reputations.*

717 P.2d at 677 n. 4 (emphasis added).

¶ 65 *Berry*'s statement that the remedy clause preserves a right to a remedy by "due course of law" is consistent with the interpretation of section 11 that all Utah cases involving the issue have employed. *See Hirpa v. IHC Hosp. Inc.,* 948 P.2d 785 (Utah 1997); *Ross v. Schackel,* 920 P.2d 1159 (Utah 1996); *Horton v. Goldminer's Daughter,* 785 P.2d 1087 (Utah 1989); *Sun Valley Water Beds v. Herm Hughes & Son, Inc.,* 782 P.2d 188 (Utah 1989); *Cruz v. Wright,* 765 P.2d 869 (Utah 1988); *Berry v. Beech Aircraft Corp.,* 717 P.2d 670 (Utah 1985); *Stoker v. Stoker,* 616 P.2d 590 (Utah 1980); *Masich v. United States Smelting, Ref. & Mining Co.,* 113 Utah 101, 191 P.2d 612 (1948); *Industrial Comm'n v. Evans,* 52 Utah 394, 174 P. 825 (1918); *see also Currier v. Holden,* 862 P.2d 1357 (Utah Ct.App.1993); *cf. Brown v. Wightman,* 47 Utah 31, 151 P. 366 (1915).

¶ 66 Utah case law on this fundamental point of the effect of the remedy clause is in accord with the law recognized by a majority of courts in other states having similar con-

stitutional provisions, although in any particular case, the courts might differ in applying the general rule. In *The Right to a Remedy*, Professor Schuman stated:

> Thus, no court has adopted a rule of absolute deference to legislatures; even the most radical courts recognize that lawmakers cannot deprive plaintiffs of vested rights. Further, no court has taken an absolute approach at the other end of the spectrum, holding that the remedy guarantee prohibits any and all legislative elimination or modification of remedies. That approach would work radical changes on well settled doctrines such as statutes of limitations, workers' compensation, and sovereign immunity. *Most courts find some middle ground: they interpret the remedy guarantee to proscribe some legislation affecting remedies without completely constraining lawmakers.*

65 Temp. L.Rev. at 1208 (emphasis added). For cases that either expressly or implicitly recognize the restrictive effect of the remedy clause on arbitrary legislative action, see, for example, *Kruszewski v. Liberty Mutual Insurance Co.*, 653 So.2d 935, 937–38 (Ala. 1995), *Lankford v. Sullivan, Long & Hagerty*, 416 So.2d 996, 1000–04 (Ala.1982), *Hayes v. Continental Insurance Co.*, 178 Ariz. 264, 872 P.2d 668, 676 (1994), *Hazine v. Montgomery Elevator Co.*, 176 Ariz. 340, 861 P.2d 625, 627 (1993) (en banc), *White v. City of Newport*, 326 Ark. 667, 933 S.W.2d 800, 803 (1996), *Moore v. Ganim*, 233 Conn. 557, 660 A.2d 742, 751 & n. 31 (1995), *Young v. O.A. Newton & Son Co.*, 477 A.2d 1071, 1078 (Del.Super.1984), *Gallegher v. Davis*, 183 A. 620, 624–25 (Del.Super.1936), *Agency for Health Care Administration v. Associated Industries of Florida, Inc.*, 678 So.2d 1239, 1253 (Fla.1996), *Martinez v. Scanlan*, 582 So.2d 1167, 1171 (Fla.1991), *Kluger v. White*,

281 So.2d 1, 4 (Fla.1973), *Lemuz v. Fieser*, 261 Kan. 936, 933 P.2d 134, 141–44 (1997), *Saylor v. Hall*, 497 S.W.2d 218 (Ky.1973), *Waldon v. Housing Authority*, 854 S.W.2d 777, 778 (Ky.Ct.App.1991), *Nutbrown v. Mount Cranmore, Inc.*, 140 N.H. 675, 671 A.2d 548, 550 (1996), *Brennaman v. RMI Co.*, 70 Ohio St.3d 460, 639 N.E.2d 425 (1994), *Burgess v. Eli Lilly & Co.*, 66 Ohio St.3d 59, 609 N.E.2d 140, 142 (1993), *Hardy v. VerMeulen*, 32 Ohio St.3d 45, 512 N.E.2d 626 (1987), *Greist v. Phillips*, 322 Or. 281, 906 P.2d 789 (1995), *Kennedy v. Cumberland Engineering Co.*, 471 A.2d 195 (R.I.1984), *Daugaard v. Baltic Cooperative Building Supply Ass'n*, 349 N.W.2d 419, 424 (S.D.1984), *Jennings v. Burgess*, 917 S.W.2d 790, 793 (Tex. 1996), *Sax v. Votteler*, 648 S.W.2d 661, 664–65 (Tex.1983), and *Lewis v. Canaan Valley Resorts, Inc.*, 185 W.Va. 684, 408 S.E.2d 634, 645 (1991).[13]

¶ 67 The Framers of the Utah Constitution, in adopting Article I, section 11, intended to establish a fundamental principle to a just civil society. Unless the law provides remedies "by due course of law" for vindication of wrongs inflicted on persons, their property, or their reputations, a civil society cannot exist, as Lord Coke and Sir William Blackstone long ago observed. The Framers clearly recognized that a peaceful and just society must provide civil remedies for the protection of fundamental personal interests so that people can protect the integrity of their persons from injuries inflicted by others, their property rights from interference and misappropriation by others, and their good character from libel and slander. In addition, section 11 serves the important goal of buttressing the independence of the judiciary against improper interference by other branches of government. In sum, section 11, at bottom, seeks to secure a basic principle of justice that will, in the end, deter persons

---

13. Justice Zimmerman's argument that the Legislature has unlimited power to abrogate remedies to protect one's person, property, or reputation is not only contrary to the plain meaning of section 11, but is also inconsistent with his statement that the *"plain language of article I, section 11 prohibits the legislature and the courts from denying entirely any remedy for a legal right."*

¶ 148 (emphasis added); *cf. Noonan v. City of Portland*, 161 Or. 213, 88 P.2d 808, 822 (1938) ("The legislature cannot … abolish a remedy and at the same time recognize the existence of a right."). Justice Zimmerman does not explain how his construction of section 11 can be reconciled with that statement.

wronged by others from resorting to self-help and the inevitable violence that ensues when people take the law into their own hands rather than seeking judicial remedies.

## IV. *BERRY* DOES NOT IMPROPERLY INTERFERE WITH THE LEGISLATIVE PREROGATIVES AND DOES NOT CONSTITUTIONALIZE THE COMMON LAW, AND SECTION 11 RIGHTS ARE NOT DETERMINED BY THE COMMON LAW AS IT EXISTED IN 1896

¶ 68 Justice Zimmerman contends that *Berry* constitutionalized the common law as it existed in 1896. *See* ¶¶ 122–34. That contention is unequivocally wrong. *Berry* did not do that; in fact, it made clear that the Legislature was not bound by the common law.[14]

¶ 69 I turn first to the law that was actually established in *Berry*. Justice Zimmerman asserts that *Berry* had the effect of constitutionalizing the common law and that it improperly restricted legislative prerogatives. Justice Zimmerman's words for a unanimous Court in *Cruz v. Wright*, 765 P.2d 869 (Utah 1988), were true when written, are true now, and refute his newly contrived position that *Berry* constitutionalized the common law and improperly interferes with legislative power. In *Cruz*, Justice Zimmerman quite correctly described *Berry*'s construction of Article I, section 11 and its relationship to the common law:

Nowhere in this state's jurisprudence is it suggested that article I, section 11 flatly

prohibits the legislature from altering or even abolishing certain rights which existed at common law. *See Berry ex rel. Berry v. Beech Aircraft*, 717 P.2d 670, 676, 680 (Utah 1985). *In fact, in Berry, we specifically stated that the legislature may eliminate or abrogate a cause of action entirely if there is sufficient reason and the elimination or abrogation "is not an arbitrary or unreasonable means [of] achieving the objective."* 717 P.2d at 680.

765 P.2d at 871 (emphasis added) (some citations · omitted). Consistent with this language, *Cruz* held that the Married Woman's Act, which abolished a married man's common law right of action for loss of his wife's consortium, did not violate Article I, section 11. *See id.* at 869, 871. Justice Zimmerman's statement in *Cruz* about *Berry*'s effect on legislative power and the common law is irreconcilable with what he now says.

¶ 70 Nothing in *Berry* or its doctrine supports Justice Zimmerman's newfound contention. The *Berry* opinion is as explicit as language can be that the proper construction and application of Article I, section 11 does not constitutionalize the common law. *See Berry*, 717 P.2d at 676; Guymon, 1997 Utah L.Rev. at 898–99.

¶ 71 The issue in *Berry* was the constitutionality of a products liability statute of repose that abrogated *all legal remedies for personal and property injuries caused by defective products after an arbitrarily fixed period of time, irrespective of the nature of the particular product or its potential dan-*

---

**14.** To the extent that his conclusion finds support in *Ross*, which, at least in part, looked to the common law as it existed in 1896 in resolving an issue of the constitutionality of a statutory official immunity provision, *Ross* was a departure from *Berry*. The *Berry* opinion and the test it adopted did not require or justify *Ross*'s reliance on the common law in 1896 in deciding the issue of official immunity. The decision in *Ross* did not apply the *Berry* test at all, nor did it comply with or apply other principles laid down in *Berry*. *Ross* held that a prisoner had no remedy for malpractice against a prison doctor because under the common law in 1896, a prison doctor could have been entitled to official immunity.

The analysis employed in *Ross* was not consistent with *Berry*. Issues of the constitutionality of official immunity under Article I, section 11 are correctly decided under the principles stated in *Berry*. It is undeniable that *Berry* explicitly and pointedly emphasized that section 11 did not constitutionalize the common law. *See, e.g., Berry*, 717 P.2d at 676; Paxton R. Guymon, Note, *Utah Prison Physicians: Can They Commit Malpractice With Impunity or Does Their Official Immunity Violate the Open Courts Clause?*, 1997 Utah L.Rev. 873, 898–99. I shall discuss *Ross* in greater detail *infra*.

*gerousness.*[15] The justification for the statute was that it was necessary to solve the problem of rapidly escalating products liability insurance premiums. As shown below, that "justification" was a mere pretense with no factual basis.

¶ 72 *Berry* was an action for damages arising from a husband's and father's death caused by an airplane crash. The complaint alleged actions based on common law negligence, strict liability, and breach of warranty. In holding unconstitutional the statute's abrogation of *all* legal remedies before the injury occurred, the Court relied on the plain meaning of the remedy clause in section 11. The legal right to recover for an "injury" to one's "person" was clearly established by the extant substantive tort and products liability law. After carefully assessing the Legislature's "factual" findings that supposedly justified its abrogation of remedies, the Court held that the statute of repose was an arbitrary and wholly unjustified abrogation of *every possible legal remedy* plaintiffs had for their injuries.

¶ 73 Nevertheless, *Berry* made clear that *no person has a "vested right"* in a rule of law, as such, under either the open courts or the due process provision of the Utah Constitution. 717 P.2d at 675. As a corollary to that principle, *Berry* declared, contrary to Justice Zimmerman's repeated assertions:

> [N]*either the due process nor the open courts provision constitutionalizes the common law or otherwise freezes the law governing private rights and remedies of the time of statehood. It is, in fact, one of the important functions of the Legislature to change and modify the law that governs*

*relations between individuals as society evolves and conditions require.*

*Id.* at 676 (emphasis added) (citation and footnote omitted).

¶ 74 Having established that fundamental principle, *Berry* explicitly recognized—contrary to Justice Zimmerman's repetitious assertions otherwise—the broad power the Legislature necessarily has in "defining, changing, and modernizing the law," albeit without eradicating the rights of citizens to a remedy under the law for civil wrongs:

> *Necessarily, the Legislature has great latitude in defining, changing and modernizing the law, and in doing so may create new rules of law and abrogate old ones.* Nevertheless, the basic purpose of Article I, section 11 is to impose some limitation on that power for the benefit of those persons who are injured in their persons, property, or reputations since they are generally isolated in society, belong to no identifiable group, and rarely are able to rally the political process to their aid.

*Id.* (emphasis added). *Berry* also recognized that section 11 rights are not always paramount and that they do

> not sweep all other constitutional rights and prerogatives before them. They, too, like many constitutional rights, must be weighed against and harmonized with other constitutional provisions. The accommodation of competing, and sometimes clashing, constitutional rights and prerogatives is a task of the greatest delicacy, although common and necessary in constitutional adjudication.

*Id.* at 677.

¶ 75 *Berry* held that the Legislature is not free to abrogate legal remedies for inju-

---

**15.** The statute of repose barred all remedies irrespective of whether the defendant's conduct was grossly negligent, reckless, or even intentional: The immunity from suit conferred protects all manufacturers, both domestic and foreign, and all persons in a manufacturer's chain of distribution, from the manufacturer to the last seller. *Section 3 is not aimed at abolishing nuisance suits; on the contrary, its purpose, as shown below, is to bar injured plaintiffs' judicial remedies in wholly meritorious cases.* The immunity granted is not related to the degree

of the manufacturer's culpability in placing a defective product in the stream of commerce. Thus, the immunity is not limited to actions based on strict liability, but extends also to actions based on negligence, gross negligence, recklessness, willful misconduct, and even intentional misconduct, such as a manufacturer's intentional failure to warn of *known* dangerous defects that could cause widespread injury or death.

*Berry,* 717 P.2d at 673 (first emphasis added).

ries to one's person, property, or reputation for arbitrary or capricious reasons. To achieve that purpose, *Berry* established a two-part test to determine the constitutionality of a statute which abrogates remedies that vindicate the interests protected by section 11:

> First, section 11 is satisfied if the law provides an injured person an effective and reasonable alternative remedy "by due course of law" for vindication of his constitutional interests. The benefit provided by the substitute must be substantially equal in value or other benefit to the remedy abrogated in providing essentially comparable substantive protection to one's person, property, or reputation, although the form of the substitute remedy may be different. . . .
>
> Second, if there is no substitute or alternative remedy provided, abrogation of the remedy or cause of action may be justified only if there is a clear social or economic evil to be eliminated and the elimination of an existing legal remedy is not an arbitrary or unreasonable means for achieving the objective.

*Id.* at 680.[16]

¶ 76 Justice Zimmerman's contention that the *Berry* test is flawed because it is unduly restrictive of legislative power is absurd. The irrefutable fact is that, applying that test, this Court has held only two statutory provisions unconstitutional: the products liability statute of repose in *Berry* and the architect and builders statute of repose.[17] Today this Court properly holds a revised (and far less arbitrary) architect and builders statute of repose constitutional. Given today's ruling, the net effect of the *Berry* test

has been to strike *one* statute, the products liability statute of repose. That hardly supports Justice Zimmerman's repeated assertions that the *Berry* test has unduly intruded on legislative power.

¶ 77 Furthermore, the *Berry* test is essentially the same test that the United States Supreme Court has used in determining whether "life, liberty, or property" has been denied under a substantive interpretation of the Fourteenth Amendment Due Process Clause. That test is not, as Justice Zimmerman would have it, a highly stringent restriction on legislative power. The *Berry* test is also similar to the due process and equal protection of the laws tests that this Court has historically applied. Using the *Berry* test, this Court has recently sustained the Legislature's power to enact statutes that change or abrogate the right to a remedy in a number of cases. *See, e.g., Hirpa,* 948 P.2d at 794; *Cruz,* 765 P.2d at 869; *see also Ross,* 920 P.2d at 1166; *Masich,* 191 P.2d at 624. Indeed, both this Court and the Legislature have abolished obsolete common law actions, irrespective of their status in 1896, notwithstanding section 11. *See, e.g., Norton v. Macfarlane,* 818 P.2d 8, 17 (Utah 1991) (tort of criminal conversation abolished); *Stoker,* 616 P.2d at 591 (intra-family tort immunity partially abolished); *Sessions v. Thomas D. Dee Memorial Hosp. Ass'n,* 94 Utah 460, 78 P.2d 645 (1938) (tort immunity for charities abolished).

¶ 78 The products liability statute of repose at issue in *Berry* totally abrogated all legal remedies for persons injured after the statutory repose period elapsed. Because the Legislature provided no alternative remedy, the Court's analysis moved to the second part of the *Berry* test to determine (a)

---

**16.** Justice Zimmerman argues that, in his opinion, the "failings" of *Berry*'s analytical model illustrate why Article I, section 11 provides procedural rather than substantive limitations. ¶¶ 120–38. Assuming arguendo that the *Berry* "analytical model" is flawed, that does not by any logic prove that a *substantive* interpretation of the remedy provision in Article I, section 11 is not a correct reading of its plain meaning. Justice Zimmerman's assertion that the "plain meaning" of section 11 is demonstrated by the asserted inadequacy of the *Berry* test is a glaring

non sequitur. Whether the *Berry* test properly applies the remedies clause of Article I, section 11 is wholly separate from the issue of whether that clause establishes a limitation on legislative power.

**17.** *Sun Valley Water Beds* and *Horton* both held the exact same architect and builders statute of repose unconstitutional.

whether there was a clear social or economic evil to be eliminated and (b) whether the abrogation of legal remedies was an arbitrary or unreasonable means for achieving that objective.

¶ 79 The Legislature asserted justification for the elimination of an injured person's legal remedies by the need to solve what it said was an "insurance premium crisis." *Berry*, 717 P.2d at 681. This Court held that the abrogation of a person's legal remedies was unconstitutional because the statute of repose was arbitrary and unreasonable in the sense that the statute could not possibly contribute to the solving of the presumed "insurance premium crisis." *Id.* at 681–82. The statute's abrogation of legal remedies for injuries produced by defective products would not reduce products liability insurance premiums in Utah for the simple reason that insurance premiums for Utah manufacturing companies were based on "nationwide data, not on a manufacturer's experience in Utah." *Id.* Thus, even a total abrogation of all products liability claims whenever they arose— even if before the running of the statute of repose—would have had no effect on insurance rates in Utah. In truth and fact, the assertion of an insurance crisis in Utah was a pure sham. The legislative finding that the number of claims for damages arising from defective products had increased greatly in recent years was simply factually not true in Utah. A survey of 500 members of the Utah Manufacturers' Association disclosed that *only one* manufacturer had reported a products liability claim made against it. *See id.* at 681.

¶ 80 Furthermore, even if, contrary to the fact, there were an "insurance crisis" in Utah, the statute of repose was an arbitrary means for accomplishing the legislative purpose. "The statute does not even purport to approximate an average expected life of the products covered, nor is it based on products that presented particular safety difficulties. It applies alike to toasters, automobiles, road graders, and prescription drugs." *Id.* The statutory six- and ten-year periods after which all remedies were barred were arbitrary and unreasonable because the statute presumed that the useful life of all products was the same, from lipstick to dynamite, to aircraft, and to automobiles. Given the falsity of the stated factual basis for the Legislature's actions and the arbitrariness of the means used, the Court held that the statute of repose was "arbitrary [and] unreasonable, and [would] not achieve the statutory objective." *Id.*

¶ 81 Justice Zimmerman's contention that the *Berry* test is "unworkable[,] ... subject to manipulation, ... leads to absurd results, and ... distorts our relationship with the legislature," ¶ 108, is simply factually wrong. The *Berry* two-part test allows the Legislature considerable latitude to modify and even eliminate judicial remedies where appropriate. Under the first part of the test, the so-called quid pro quo part, the Legislature may establish statutory remedies in the place of common law remedies, as the Legislature has done in enacting the Workers' Compensation Act and the Occupational Disease Act. *See also* Utah No–Fault Automobile Insurance Act, Utah Code Ann. §§ 31A–22–301 to –310 (1998); *Berry,* 717 P.2d at 677; *Masich,* 191 P.2d at 612. Each Act totally abrogates common law remedies and substitutes therefor statutory remedies administered by an administrative agency in the case of the first two Acts and, in the case of the No–Fault Act, an insurance contract remedy.

¶ 82 Justice Zimmerman's assertion that the *Berry* test is unworkable and leads to absurd results is also wholly detached from an objective appraisal of Utah case law. Responding point by point is unnecessary. A reading of our cases demonstrates the error of the assertion. Suffice to say, the *Berry* test is the same test that the United States Supreme Court has applied under the Due Process Clause of the Fourteenth Amendment in deciding whether one has been denied life, liberty, or property. *See, e.g., Brinkerhoff–Faris Trust & Sav. Co. v. Hill,* 281 U.S. 673, 680–82, 50 S.Ct. 451, 74 L.Ed. 1107 (1930); *Crane v. Hahlo,* 258 U.S. 142, 42 S.Ct. 214, 66 L.Ed. 514 (1922); *see also*

*PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 94, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980) (Marshall, J., concurring) (stating that reasonable alternative remedy must be provided when core common law rights are abolished); *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *Condemarin*, 775 P.2d at 366–69 (Zimmerman, J., concurring) (explaining due process approach); *Mineer v. Industrial Comm'n*, 572 P.2d 1364, 1366 (Utah 1977); *State v. Mason*, 94 Utah 501, 78 P.2d 920, 925–26 (1938).

¶ 83 Justice Zimmerman's further assertion that *Berry* is "inconsistent with our pre-*Berry* case law," ¶ 144, is unequivocally incorrect. Forty years before *Berry* was decided, this Court held in *Masich* that the remedy clause in section 11 was a substantive limitation on the Legislature's power to abolish remedies. Nevertheless, the Court held that the statute at issue, the Occupational Disease Act, which barred all common law tort actions for partial disability caused by an occupational disease, did not violate the limitation that Article I, section 11 imposed on legislative power. *See* 191 P.2d at 624–25.

¶ 84 The issue in *Masich* was whether the exclusive remedy provision of the Act could constitutionally abrogate common law negligence actions against an employer by a worker who was *partially disabled* by silicosis. The Act provided compensation for *total disability* only. The worker argued that the Act was unconstitutional under Article I, section 11 because the exclusive remedy provision abrogated his common law remedy for damages against the employer and because he was accorded no substitute statutory remedy under the Act. The Court stated:

> The contention is made that if a partially disabled employee is not granted compensation and, further, is denied his common law right of action then he has been deprived of his *remedy by due course of law for an injury done to him in his person*, contrary to the provisions of the Constitution of this state.

*Id.* at 623. The Court then quoted Article I, section 11 and acknowledged that if the Legislature were to abolish all right to compensation and all common law rights for negligence by an employee, "no contention could reasonably be made that it was a proper exercise of the police power. The reverse would be true and pauperism with its concomitants of vice and crime would flourish." *Id.* at 624.

¶ 85 Although the Act provided no alternative statutory remedy for partial disability,[18] the Court stated that overall the Act provided broader remedies in some respects to employees than existed at common law. The Act abolished the common law fellow-servant rule and the defenses of assumption of risk and contributory negligence, and imposed, in lieu of common law damage actions, statutory actions for compensation (not damages) based on strict liability. The Court stated, "The humanitarian principles of the occupational disease act do overcome in part, the inadequacy of relief at common law for a class of employees, and the act should not be discarded because some members of the class

**18.** The Court explained:

> There must have been some reason for the Legislature to limit the compensation to those employees who are totally disabled and to the dependants of those who are deceased. We are not of the opinion that the Legislature intended to deny compensation to partially disabled employees and to deny them enforcement of their common law right without reason or just cause. Neither are we of the opinion that the Legislature intended to preserve their common law right when it was well aware of the abuses that had brought about occupational disease legislation and the confusion that would exist if the degree of disability

> controlled the forum. We are convinced the Legislature, because of the nature of the disease, the length of time for development, the difficulty of proof, the inability to properly apportion the negligence between employers, the cost and expense of litigation and the small return to the employee, decided to deal with silicosis through the commission and to require both the employer and the employee to shoulder part of the costs of occupational disease without regard to the negligence of either. The employee to share the burden during partial disability, and the employer when disablement or death occurred.
>
> *Id.* at 625.

have rights, which may be adversely affected." *Id.* at 624.

¶ 86 Significantly, all members of the Court that decided *Masich*—Justices Latimer, McDonough, Wolfe, Pratt, and Wade (who dissented on the narrow ground that as a matter of statutory construction the Act did not bar a common law claim for partial disability) were of the view that Article I, section 11 imposed a substantive guarantee of a remedy by due course of law that the Legislature could not ignore without having a substantial, nonarbitrary basis for doing so. That, indeed, has been the unanimous view of each and every justice of this Court who has ever ruled on the construction of Article I, section 11—some thirteen justices in all, including Justice Zimmerman—until his lone opinion in this case.

¶ 87 *Hirpa v. IHC Hospitals, Inc.*, 948 P.2d 785 (Utah 1997), decided barely a year ago with the concurrence of Justice Zimmerman and all other members of the Court, refutes Justice Zimmerman's assertion that the *Berry* test is unduly rigid and unworkable. *Hirpa* relied on *Berry* in sustaining the constitutionality of the Utah Good Samaritan Act against a challenge under Article I, section 11 of the Constitution. That Act barred all negligence actions against a doctor who volunteered his services in an emergency situation. In applying the *Berry* test, the Court first found that the plaintiff had no alternative remedy to that of an action against a doctor who allegedly committed malpractice as a volunteer in an emergency situation. *Id.* at 792. Nevertheless, the statute was held constitutional under the second part of the *Berry* test. The Court found that the legislative purpose of the statute was to eliminate the "evil" of deterring doctors from giving medical assistance in emergencies because of the common law rule that legal liability could be imposed on a doctor who volunteered medical care in an emergency. The Court stated:

> Receiving physician-rendered medical care can significantly increase the likelihood of surviving a life-threatening situation. Therefore, it must be considered a social evil that the common law actually contained disincentives to licensed medical providers who were potentially able to respond to an emergency and render medical care. The legislature remedied this situation by immunizing licensed medical providers who sought in good faith to aid others by rendering emergency medical care.

*Id.* at 793–94.

¶ 88 It is true that the Court also undertook an analysis of whether the common law at the time of statehood would have provided immunity for a volunteer's negligence and concluded that there would have been immunity. *See id.* at 793. But that inquiry, apparently prompted by the opinion in *Ross v. Schackel*, was wholly unnecessary; it was certainly not required by our opinion in *Berry*.[19] *Hirpa*'s holding that the statute was constitutional under the *Berry* test was by itself dispositive.

¶ 89 In sum, this Court has made clear in numerous cases that the Legislature has the power to create, modify, and abolish causes of action. *Berry* quoted *Masich* that " 'no one has a vested interest in any rule of law,' " 717 P.2d at 675, and that " '[n]ecessarily, the Legislature has great latitude in defining, changing, and modernizing the law, and in doing so may create new rules of law and abrogate old ones.' " *Id.* at 676. These same principles have been restated and reemphasized in numerous other cases. *See, e.g., Horton*, 785 P.2d at 1087; *Sun Valley*, 782 P.2d at 188.[20]

¶ 90 In sum, *Hirpa, Cruz, Berry, Norton*, and *Masich* clearly demonstrate that our sec-

---

19. *See supra* note 14.

20. Justice Zimmerman joined the opinions in *Horton* and *Sun Valley* but now argues that those cases illustrate an undue rigidity in the *Berry* test. Indeed, in *Lee v. Gaufin*, 867 P.2d 572, 590 (Utah 1993), he wrote a separate concurring opinion holding a statute of repose on minors' claims for injuries unconstitutional under Article I, section 11. He now argues that any statute of repose would be unconstitutional under *Horton* and *Sun Valley*. He chooses to ignore the plain fact that the opinions in both *Horton* and *Berry* expressly reject the proposition that all statutes of repose violate section 11.

tion 11 cases do not "freeze the common law," elevate it over the statutory law, or unduly restrict legislative power. Indeed, Justice Zimmerman's present position rings hollow in light of his prior ardent advocacy of the principles laid down in *Berry*,[21] including its construction of Article I, section 11.

¶ 91 Justice Zimmerman's repetitious assertions that *Berry* constitutionalized the common law as of 1896 are simply incorrect. There is nothing in the *Berry* opinion that supports that contention. In fact, *Berry* explicitly states the exact opposite: "[N]either the due process nor the open courts provision constitutionalizes the common law or otherwise freezes the law governing private rights remedies as of the time of statehood." *Berry*, 717 P.2d at 676; *see also DeBry v. Noble*, 889 P.2d 428, 435–36 (Utah 1995). Indeed, this Court has abolished outmoded common law causes of action and immunities that existed in 1896 and has sustained legislative enactments doing the same. *Norton*, 818 P.2d at 8, abolished the tort of criminal conversation; *Hackford v. Utah Power & Light Co.*, 740 P.2d 1281 (Utah 1987), construed a statute that abolished the common law right of a husband to recover for personal injuries to his wife and that gave the right of recovery to the wife; *Stoker*, 616 P.2d at 590, abolished intra-family tort immunity with respect to intentional batteries committed by one spouse on another. As noted above, the No–Fault Insurance Act barred tort recovery of certain kinds of damages for automobile accident victims in lieu of an insurance remedy. The most far-reaching legislative abolition of common law tort remedies is in the Workers' Compensation Act and the Occupational Disease Act, which bar common law negligence actions against fellow workers and employers and created new statutory remedies that provide limited insurance benefits based on strict liability of the employer. *Masich* specifically sustained the constitutionality of the Occupational Disease Act and, by implication, the constitutionality of the Workers' Compensation Act, against an attack under Article I, section 11. The Court did not give the slightest suggestion that the common law remedies that were abrogated had any constitutional status, as Justice Zimmerman would have it.

¶ 92 In short, Justice Zimmerman's contention that our cases have constitutionalized the common law as it existed in 1896 (or at any other time) misstates the cases that have been decided under Article I, section 11 and

---

**21.** Justice Zimmerman's concurring opinion in *Condemarin*, 775 P.2d at 366–69, provides an eloquent exposition of one of the important reasons that undergirds section 11 rights:

In *Berry*, this Court firmly staked itself out as finding substantive protections in article I, section 11's guarantee to "every person" of a "remedy by due course of law" for "an injury done to him [or her] in his [or her] person, property or reputation." Today's decision is a logical successor to *Berry*. ...

The present case has given me a better appreciation of the wisdom of including article I, section 11's guarantee in Utah's basic charter. The constitution's drafters understood that the normal political processes would not always protect the common law rights of all citizens to obtain remedies for injuries. *See Berry*, 717 P.2d at 676; *cf. Developments in the Law: The Interpretation of State Constitutional Rights*, 95 Harv.L.Rev. 1324, 1498–1502 (1982) (protection of majority from politically powerful minorities as an approach to state constitutional interpretation); Note, *State Economic Substantive Due Process: A Proposed Approach*, 88 Yale L.J. 1487, 1498 (1979) (perfunctory judicial review is inadequate to protect against special interest legislation). At any one time, only a small percentage of the citizenry will have recently been harmed and therefore will need to obtain a remedy from the members of any particular defendant class. The vast majority of the populace will have no interest in opposing legislative efforts to protect such a defendant class because the majority will not readily identify with those few persons unlucky enough to have been harmed. And those few persons directly affected will, in all likelihood, lack the political power to prevent the passage of legislation that, in essence, requires every member of the citizenry who is injured by members of the defendant class to bear some or all of the cost of those injuries.

. . . .

To accord these rights the respect the drafters intended requires that we approach challenges to legislation alleged to infringe article I, section 11 differently than we otherwise view claims of unconstitutionality that are directed at ordinary economic legislation. *Id.* at 366–68.

the principles that govern the application of that provision. His conclusion that *Berry*'s analytical model is "unworkable, leads to strained analyses and quixotic results, and distorts the relationship between the legislature and the courts," ¶ 122, is based squarely on the erroneous proposition that *Berry* constitutionalized the common law.

## V. SOVEREIGN IMMUNITY AND ARTICLE I, SECTION 11

¶ 93 Of course, common law tort immunities, such as sovereign and official immunity, may clash with the right to a remedy for injuries to one's person and property under Article I, section 11 and have presented an important and somewhat difficult subset of issues. Justice Zimmerman states, "[T]he cold fact is that whether a cause of action existed in 1896 has become the determinative factor for whether article I, section 11 is transgressed by the enactment of governmental immunity." ¶ 123. That statement is in flat contradiction to the law established in *DeBry v. Noble.* As a consequence, his "analysis" of Utah sovereign immunity cases misstates Utah law.[22]

¶ 94 By way of background, the law of sovereign immunity originated as a judge-made law in the United States and was adopted in this state in case law. It remained a common law doctrine until the Legislature enacted the Utah Governmental Immunity Act in 1965, which codified the general common law doctrine but modified and liberalized its specific application in certain ways. *See* 1965 Utah Laws 390, ch. 139; *DeBry,* 889 P.2d at 432–40. *See generally* Guymon, 1997 Utah L.Rev. at 880–81. As a general rule, the law of governmental immunity bars remedies against government agencies for personal and property injuries, but there have long been numerous exceptions to the general rule. This Court has made clear that governmental immunity, as such, is not overridden by Article I, section 11. Governmental immunity was a clearly recognized part of the law when the Utah Constitution was framed, and the Framers of the Constitution must have deemed governmental immunity to be an exception to the right to a remedy protected by Article I, section 11.[23] *See DeBry,* 889 P.2d at 435, 436; *see also Madsen v. Borthick,* 658 P.2d 627 (Utah 1983).

¶ 95 In discussing the relationship of governmental immunity and Article I, section 11 rights, Justice Zimmerman states that "despite *Berry*'s disclaimer that article I, section 11 does not constitutionalize the common law as it existed at statehood, the cold fact is that whether a cause of action existed in 1896 has become the determinative factor for whether article I, section 11 is transgressed by the enactment of governmental immunity." [24] ¶ 123. That is not correct.

¶ 96 Both *DeBry* and *Madsen* squarely held that the doctrine of sovereign immunity

---

22. For example, he contends that *McCorvey v. Department of Transportation,* 868 P.2d 41 (Utah 1993), held that the cap on damages recoverable from a government entity in Utah Code Ann. § 63–30–34(1) did not violate Article I, section 11 because there was no right to recover damages from the state for injuries resulting from the negligent maintenance of public roads. But in so ruling, the Court did not refer to the common law as it existed in 1896. Of course, the common law in general is relevant to whether the law provides a remedy by "due course of law" simply because the common law historically and still today is the repository of most of the remedies that the law provides for the protection of "person, property, and reputation."

23. As noted, state constitutions in several states specifically recognized sovereign immunity as an exception to the substantive rights protected by their open courts provisions. *See, e.g., Tennessee's Open Court's Clause* at 436 & n. 602.

24. Justice Zimmerman refers to the "absurdity" of common law rules that allowed an individual injured on a city road because of government negligence to recover damages but did not allow an individual injured on a state road because of government negligence to recover damages. *See* ¶ 124. Indeed, that is an absurdity, but it is not an absurdity that has anything to do with Article I, section 11. It is an artifact of the doctrines of sovereign and municipal immunity as those doctrines developed historically. That inconsistency does not now exist. The Legislature has waived immunity with respect to both types of roads and treated them exactly the same for immunity purposes. *See McCorvey,* 868 P.2d at 47.

The effect of *Condemarin* and *DeBry* is that the scope of governmental immunity in relation to Article I, section 11 should be decided on the basis of fundamental policy considerations in light of modern conditions, with due consideration given to the presumption of constitutionali-

did not, as a general proposition, violate Article I, section 11. *DeBry,* 889 P.2d at 432–42; *Madsen,* 658 P.2d at 629. In addition, *DeBry* established the standard for determining what government activity is immune and falls outside Article I, section 11 protections. Clearly, not all government action was subject to governmental immunity, and the government action that was not immune would give rise to tort liability and recovery of damages. *See DeBry,* 889 P.2d at 436–40.

¶ 97 The government activity at issue in *Madsen* was the supervision and regulation of financial institutions. The plaintiff claimed damages from the state for negligence in performing those functions. The Court held that the supervision and regulation of financial institutions was a "core governmental function" that was clearly within the scope of the governmental immunity doctrine. Therefore, there was no cause of action for damages based on negligence. And that was so irrespective of whether negligent government regulation of financial institutions would have been protected by governmental immunity from actions for damages in 1896. *See Madsen,* 658 P.2d at 631;[25] *see also Gillman v. Department of Fin. Inst.,* 782 P.2d 506 (Utah 1989). In short, the analysis had nothing to do with whether there was a cause of action for negligent government supervision of financial institutions in 1896. The analysis was based on an assessment of the effect that tort liability would have on government operations.

¶ 98 *Condemarin v. University Hospital,* 775 P.2d 348 (Utah 1989), was the first case to address the interface between Article I, section 11 rights and sovereign immunity. That case was decided by a majority made up of Justices Durham, Zimmerman, and Stewart. Justice Durham wrote the lead opinion in which Justice Zimmerman concurred to a large extent. Justices Zimmerman and Stewart also wrote separate concurring opinions. All three justices agreed that sovereign immunity for tort liability was limited, to some extent, by the rights protected by Article I, section 11. Justices Durham and Zimmerman, relying on due process and Article I, section 11, held that the statutory cap limiting damages to $100,000 per person was unconstitutional in an action against a state-operated hospital. Justice Stewart also held the cap unconstitutional, but relied on the uniform operation of the laws provision, Article I, section 24. In holding that the operation of a state-owned hospital was not subject to immunity, the majority justices did not look to the common law as it existed in 1896.

¶ 99 The relationship between governmental immunity and Article I, section 11 rights was addressed again by the Court in a more definitive manner after an extensive review of Utah case law from territorial days to the present in *DeBry,* which sustained governmental immunity with respect to enforcement of building code regulations. *DeBry* added to the *Condemarin* analysis by focusing on the historical concept of "core

ty accorded the Governmental Immunity Act. *See DeBry,* 889 P.2d at 440.

25. *Madsen* relied on *Brown v. Wichita State University,* 219 Kan. 2, 8–12, 547 P.2d 1015, 1022–24 (1976), for the proposition that Article I, section 11 does not make sovereign immunity, as such, unconstitutional under an "open courts" clause. The Court in *Madsen* stated that it concurred in "the reasoning and result" of *Brown. Madsen,* 658 P.2d at 629. The Kansas Supreme Court in *Brown* made clear that its guaranteed remedy clause in its open courts provision, which is virtually identical to Utah's, is a substantive limitation on legislative power, as are a number of other states' guaranteed remedy provisions that are referred to in *Brown. Brown,* 547 P.2d at 1024. The Kansas Supreme Court held that "a broad application of Section 18 [the Kansas open courts provision] would jeopardize retention of governmental immunity even for governmental functions." *Id.* at 1024. That is the same position that this Court adopted in *Madsen,* 658 P.2d 627 (Utah 1983), *Condemarin v. University Hospital,* 775 P.2d 348 (Utah 1989), and *DeBry v. Noble,* 889 P.2d 428 (Utah 1995). For similar holdings in other states, see *Firemen's Insurance Co. v. Washburn County,* 2 Wis.2d 214, 85 N.W.2d 840 (1957) (construing Wisconsin constitutional provision similar to Utah's), *Williams v. Columbus,* 33 Ohio St.2d 75, 294 N.E.2d 891 (1973), *Cords v. State,* 62 Wis.2d 42, 214 N.W.2d 405 (1974), *Hazlett v. Board of Commissioners,* 168 Okla. 290, 32 P.2d 940 (1934), and *Lundbeck v. State Department of Highways,* 95 Idaho 549, 511 P.2d 1325 (1973).

governmental functions," as the key determinant of governmental tort immunity. In *De-Bry,* the plaintiffs asserted a right to sue Salt Lake County for negligence on the ground that the county and its agents, in supervising the building code regulations and in issuing and denying building permits, had negligently caused damage to the plaintiffs. The county defended on the ground of governmental immunity. The Court undertook an extensive review of the history of sovereign immunity and how it had been applied. The Court held that the central concept that had historically and functionally defined governmental immunity over time was that "core governmental functions" were immune from tort liability. In short, governmental immunity should be based on "considerations relevant to the task of providing necessary protection for essential governmental activities." *DeBry,* 889 P.2d at 440. But those considerations are not static or fixed as of 1896. By necessity, they have been, and must continue to be, somewhat flexible over time as government and its role change in response to the needs and demands of society.

¶ 100 Parenthetically, it should also be noted that this Court has not been hostile to undertaking a realistic appraisal of the potential effect of liability on the need to protect government agencies from lawsuits that might impair their ability to carry out their duties. In addition, this Court has established the doctrine that, apart from governmental immunity, certain kinds of government activities are not subject to liability because there is no tort duty of due care on the part of the government agency or employee, even though the government agency has a "general" duty to protect the public. *See, e.g., Madsen v. Borthick,* 850 P.2d 442, 444 (Utah 1993); *C.T. v. Martinez,* 845 P.2d 246, 247–48 (Utah 1992); *Ferree v. State,* 784 P.2d 149, 151 (Utah 1989). The Court has held government entities not liable for natural catastrophes, or "acts of God." *See Rocky Mountain Thrift Stores v. Salt Lake City,* 887 P.2d 848, 852 (Utah 1994).

## VI. CONCLUSION

¶ 101 In sum, what is put at stake in Justice Zimmerman's opinion is whether the judges of this Court are willing to construe the Constitution as the Framers drafted it and apply its plain meaning, or whether—for whatever reason—judges can pick and choose which constitutional provisions we will apply and which we will construe into a nullity.

¶ 102 The protection of person, property, and reputation by due course of law is fundamental to a peaceful society based on the rule of law. Without that protection, property rights can be violated at will and the foundation of capitalism destroyed. Without that protection, the individual loses the safety and integrity of his or her person and reputation. The Framers intended that the people of Utah have those basic constitutional protections. Justice Zimmerman's "interpretation" of Article I, section 11 is inconsistent with the plain language of that section; it is inconsistent with the historical context of that section; it is inconsistent with this Court's case law under that section; and it is inconsistent with his own statements in previous cases.

¶ 103 Associate Chief Justice DURHAM concurs in Justice STEWART's concurring opinion.

HOWE, Chief Justice, concurring with reservation:

¶ 104 I concur but write to express a reservation about certain dicta in the majority opinion. The majority opinion states that because of the "subject to" language of subsections (4) and (5) of Utah Code Ann. § 78–12–25.5, a person would always have two years to bring an action if it was discovered before the expiration of the sixth or the twelfth year. I do not agree that a person discovering a contract action in the fifth year or a tort action in the eleventh year would have two years to bring an action.

¶ 105 My interpretation of the statute is that no action may be brought later than the sixth or twelfth year except where the action is discovered in the sixth or twelfth year. In such a circumstance, the injured person has

an additional two years from the date of discovery to commence an action. No such extension is granted to persons who discover their actions in years other than the sixth or twelfth year. It is true that a person discovering his action in the fifth or eleventh year would have less than a full two years to commence an action. However, that is not unusual. In *Atwood v. Sturm, Ruger, & Co.*, 823 P.2d 1064 (Utah 1992), and again in *Williams v. Howard*, 970 P.2d 1282 (Utah 1998), we held that a plaintiff was not entitled to additional time to bring his action where he discovered it during the running of the statute of limitations and a reasonable time remained for him to bring his action before the expiration of the limitations. The same rule applies here. An injured person discovering his action in the fifth or eleventh year would still have more than one year to bring it.

¶ 106 While the statutory language is somewhat confusing, it appears to me that section 78–12–25.5(3) broadly provides that an action against a provider may be commenced within two years from the discovery of the act, error, omission, or breach of duty, or when the same should have been discovered through reasonable diligence.[1] Subsections (4) and (5) qualify and restrict the broad provision of subsection (3) by providing that no action for breach of contract or warranty may be commenced more than six years after completion of the improvement, and no other type of action may be commenced more than twelve years after completion. However, when discovery is made in the sixth or twelfth year, respectively, the injured person has an additional two years from the date of discovery to commence an action.

¶ 107 The majority interprets the "subject to" language of subsections (4) and (5) to require that the periods of repose contained in those subsections yield to the right of a person under subsection (3) to always have two years to bring an action. However, once it is conceded that subsection (3) is paramount to subsections (4) and (5), then it follows that the discovery rule in subsection (3) would also be paramount to the periods of repose in subsections (4) and (5). This interpretation would eviscerate the statute, essentially removing the periods of repose which are the heart of the statute. Therefore, in my opinion, the "subject to" language of subsection (4) must be read to mean "notwithstanding subsection (3)," since it modifies and restricts subsection (3). The "subject to" language of subsection (5) must be read to mean "notwithstanding subsection (3) and subject to subsection (4)."

ZIMMERMAN, Justice, concurring in the result:

¶ 108 Although I agree with the result reached by the majority opinion, I disagree with the way in which it is reached.[1] More specifically, I disagree with the reasoning of the opinion to the extent that it is grounded upon the article I, section 11 jurisprudence having its origins in *Berry v. Beech Aircraft Corp.*, 717 P.2d 670 (Utah 1985). For if we are to remain true to *Berry*, I think we would have to reverse the court below. However, I concur in the result today only because I would overrule *Berry*. I think the operative test it sets forth has proven to be unworkable. It is subject to manipulation, as today's decision illustrates, it leads to absurd results, and it distorts our relationship with the legislature. Furthermore, *Berry*'s substantive interpretation of article I, section 11 is inconsistent with the language and history of that provision.[2]

¶ 109 I have said that if we are true to *Berry*, we should reverse the court below. I

---

**1.** Effective May 5, 1997, section 78–12–25.5(3)(a) was amended and "five years" was substituted for "two years."

**1.** I concur in Chief Justice Howe's interpretation of the statute as stated in his concurring opinion.

**2.** In response to this concurring opinion, Justice Stewart has chosen to write a screed attacking

not only my views on *Berry*, but me personally. Given that my opinion is written on behalf of only one member of this court and that Justice Stewart seems satisfied with the result reached by this court, I find the vehemence of his attack surprising. It may be explainable by his personal allegiance to the *Berry* opinion and its progeny. *See* J. Magelby & J. Peterson, *Justices of the*

will explain. In *Sun Valley Water Beds of Utah, Inc. v. Herm Hughes & Son, Inc.*, 782 P.2d 188 (Utah 1989), and *Horton v. Goldminer's Daughter*, 785 P.2d 1087 (Utah 1989), we struck down the earlier version of the "builders statute of repose," section 78-12-25.5. Under the logic of those *Berry* precedents, the present builders statute of repose should once again be found to violate article I, section 11. The addition of the legislative findings in section 78-12-25.5(2), findings that are relied on by the majority in upholding this statute, fail to furnish a logical basis on which to distinguish the new statute from the old one.

¶ 110 As the majority notes, the legislature set forth in the revised statute four specific costs and hardships that result from exposing providers to liability after the possibility of damage has become highly remote. *See* Utah Code Ann. § 78-12-25.5(2)(b) (Supp.1998). Those are: (i) liability insurance costs; (ii) records storage costs; (iii) undue and unlimited liability risks during the life of both a provider and an improvement; and (iv) difficulties in defending against claims many years after completion of an improvement.

¶ 111 In *Sun Valley*, however, we considered almost all of these justifications and found them insufficient to uphold a seven-year statute of repose. For example, with respect to liability insurance costs and risks we stated:

> [T]he statute does not protect the industry from a significant number of lawsuits since it appears that nationally only 2.1 percent of all claims are initiated subsequent to the seventh year from completion anyway.... [Thus] since the number of claims affected by the statute are insignificant, it is highly unlikely that lower insurance rates are inextricably tied to the existence of the architects and builders statute of repose.

782 P.2d at 193. In the instant case, the majority relies on the fact that less than one percent of claims are brought after ten years from completion to justify upholding the statute. As *Sun Valley* noted, this fact cuts against the statute because it undercuts the stated legislative purpose of reducing insurance costs, since one percent of claims is much less than the 2.1 percent discussed in *Sun Valley* as "insignificant." Furthermore, with respect to difficulties in defending old claims, we stated in *Sun Valley* that "[w]hile the passage of time causes inherent difficulty in defending any lawsuit, it also causes equal, if not greater, difficulty in initiating just legal action." *Id.* In reaching the instant result, therefore, the majority may be reciting the *Berry* rubric, but it is departing from the result that rubric requires without explicitly saying so. The fact that the majority can reach this result while purporting to follow *Berry* and its progeny, including *Sun Valley*, shows one of *Berry*'s many weaknesses. I would explicitly overrule *Berry*'s easily manipulable test and propose a new rule that more properly accords with article I, section 11.

¶ 112 First, a little history. Prior to *Berry*, this court had addressed article I, section 11 on occasion, but had never set out a definitive test to be used to determine the limits it set on the legislature's power to modify existing legal rights or remedies. In *Berry*, we broke new ground and read article I, section 11, also known as the "open courts" provision, as imposing a strong substantive limitation on the legislature's ability to limit or eliminate a cause of action for, or the remedies available for, "injury ... to ... person, property, or reputation." Having concluded that article I, section 11 contains such a substantive limitation, we set out an analytical model for determining whether a statute had improperly deprived an individu-

---

*Utah Supreme Court 1896–1996* 66 (1997). On the other hand, it may also be attributable to the fact that he sees the truth of the premise that leads me to concur in the result reached here: It is not consistent with our past *Berry* cases, and it demonstrates to me that *Berry*'s vitality is ebbing and that a majority of this court is well on its

way to abandoning its unworkable analytical model. *See infra*, note 12. In any event, I do not choose to respond to most of Justice Stewart's individual attacks. I leave it to the dispassionate reader to determine which of our positions is the most sound.

al of a "remedy by due course of law" for an "injury done to him in his person, property, or reputation." I do not agree either with the scope of the substantive limitation *Berry* found in article I, section 11 or with the analytical model founded upon it.

¶ 113 To explain this position, I start with a more detailed recapitulation of the *Berry* decision. There, we considered the constitutionality of a pair of six- and ten-year statutes of repose. To determine whether these statutes violated the open courts provision, we began with an analysis of article I, section 11's plain language. This interpretation did not involve a systematic examination of the language of the entire open courts provision, but instead merely fixed on the phrases "remedy by due course of law" and "injury done to him in his person, property or reputation." The result was a superficial interpretation of the provisions. *See Berry* at 674–75.

¶ 114 Without parsing the provision for the meaning of key words and phrases, we found that article I, section 11 was designed to accomplish three primary purposes. First, it "guarantees access to the courts and a judicial procedure that is based on fairness and equality." *Id.* at 675 (citations omitted). Second, "section 11 also establishes that the framers of the Constitution intended that an individual could not be arbitrarily deprived of effective remedies designed to protect basic individual rights." *Id.* Finally, and most critically, we found that the "guarantee of access to the courthouse was not intended by the founders to be an empty gesture; individuals are also entitled to a remedy by 'due course of law' for injuries to 'person, property or reputation.' " *Id.*

¶ 115 After declaring the general purposes of article I, section 11, we analyzed article I, section 11 "historically." Unfortunately, in my view, *Berry* 's historical analysis was limited to noting that thirty-seven states have similar constitutional provisions

that all appear to have originated with Sir Edward Coke's gloss on chapter 29 of the 1297 Magna Carta. No effort was made to determine the meaning of the open courts provision in the historical context of this state or to define what is an "injury" to "person, property or reputation." *See id.* at 675–80.

¶ 116 Next, *Berry* sought to establish a detailed analytical model for determining when the substantive protections of the provision were violated. But to do so, *Berry* first had to give explicit operative substantive content to the general purposes it found in article I, section 11. In searching for that substantive content, we stated that "[t]he meaning of section 11 must be taken not only from its history and plain language, but also from its functional relationship to other constitutional provisions." *Id.* at 675. To that end, we noted the similarities between article I, section 11 and article I, section 7, the due process clause.[3]

¶ 117 Based on this limited analysis of the substantive limitations article I, section 11 was intended to place on the legislature, we announced a two-part test for implementing those substantive limitations:

> First, section 11 is satisfied if the law provides an injured person an effective and reasonable alternative remedy "by due course of law" for vindication of his constitutional interest. The benefit provided by the substitute must be substantially equal in value or other benefit to the remedy abrogated in providing essentially comparable substantive protection to one's person, property, or reputation, although the form of the substitute remedy may be different. . . .
>
> Second, if there is no substitute or alternative remedy provided, abrogation of the remedy or cause of action may be justified only if there is a clear social or economic evil to be eliminated and the elimination of an existing legal remedy is not an arbi-

---

3. We did not, however, articulate what interests were protected by the open courts provision that

were not protected by the due process clause.

trary or unreasonable means for achieving the objective.

*Id.* at 680.[4]

¶ 118 We then applied this test to strike down the statutes of repose at issue in that case. Skipping the first prong of the analysis,[5] *Berry* examined the objectives of the Products Liability Act and determined that the statutes of repose therein were unreasonable and arbitrary and did not further the statutory objectives. *See id.* at 681–83. *Berry*'s analysis under the second prong illustrates that it is a very stringent test that gives little deference to the legislature. Although the legislature codified its legislative findings and the purpose of both statutes of repose, *see* Utah Code Ann. § 78-15-2 (1987) (repealed by Products Liability Statute of Limitation, ch. 119, § 3, 1989 Utah Laws 268), we quickly dispatched the legislature's justifications on the basis of several observations, including: (i) the arbitrary nature of the set time periods which applied to all products regardless of their useful life; (ii) our finding that while there may have been an increase in the number of products liability claims nationally, such was not the case in Utah at that time; (iii) the fact that "[p]roduct liability insurance premiums for Utah manufacturing companies are established on the basis of nationwide data, not on a manufacturer's experience in Utah"; (iv) our finding that because products liability insurance is usually provided on an "occurrence" basis, the number of claims barred by the statutes

of repose would be too small to impact insurance rates; and (v) the concern that the statutes of repose would reduce incentives to produce safe products. *Berry,* 717 P.2d at 681–83.

¶ 119 *Berry*'s policy concern for maintaining financial incentives to produce safe products, *i.e.,* tort liability for manufacturers and suppliers, sheds illumination on the extreme lack of deference this court gave legislative fact findings. Speaking from a purely theoretical viewpoint, without any hard empirical evidence to support our dissatisfaction with the legislature's decision to pass the statutes of repose, we explained our safety concerns as follows:

> The Utah statute of repose [for products liability claims] is *likely to provide less incentive to manufacturers to take adequate safety precautions* in the manufacture and design of products having a useful life of more than [the statute of repose time period], thereby increasing the already substantial number of persons who have been injured or killed by shoddy design or workmanship. *Thus, the statute may well be counterproductive in terms of public safety.*

*Id.* at 683 (emphasis added). While safety incentives may be relevant, the court's discussion of them shows that we gave no deference to the legislature on this matter. *Berry* essentially assumed that the legislature either had not considered this obvious safety issue or had considered it and wrongly con-

---

4. To justify the first test imposing a quid pro quo requirement on the legislature, this court seized upon a brief passage in *Masich v. United States Smelting, Refining & Mining Co.,* 113 Utah 101, 191 P.2d 612, *appeal dismissed,* 335 U.S. 866, 69 S.Ct. 138, 93 L.Ed. 411 (1948). *See Berry* at 680. This passage from *Masich,* however, did not concern article I, section 11 analysis. Instead, the court in *Masich* was discussing whether the Workmen's Compensation Act was a valid exercise of police power. 113 Utah at 123–25, 191 P.2d at 624. Historically, workmen's compensation acts were challenged as being beyond legislatures' constitutional power to enact. *See* 113 Utah at 124, 191 P.2d at 624. This challenge to such acts was resolved by *New York Central Railroad v. White,* 243 U.S. 188, 37 S.Ct. 247, 61 L.Ed. 667 (1917), which upheld a compulsory workmen's compensation act on the basis of a

state's police power. In the context of this historical challenge to such acts, this court in *Masich* stated that "[i]f the legislature were to abolish all compensation and all common law rights for negligence of an employer, no contention could reasonably be made that it was a proper exercise of police power." 113 Utah at 125, 191 P.2d at 624. Irrespective of the questionable support that *Masich* provides for requiring a quid pro quo analysis under article I, section 11, *Berry* imposed this requirement on the legislature if it abrogated a remedy or common law cause of action.

5. *Berry*'s failure to address the first prong of the framework was likely due to the fact that no substitute remedy was evident from the statute. Thus, *Berry* merely failed to state the obvious.

cluded that the six- and ten-year statutes of repose did not present great enough risks to the public interest to prevent their enactment. Although in the court's view, the legislature may have erred in stating the balance between the safety risks and the benefit to industry from a statute of repose, nothing in article I, section 11 bestows upon this court the unfettered right to second-guess the legislature on such a matter; nothing in that provision eliminates the traditional deference we give to the legislature when it makes policy and fact judgments. Yet we gave it no deference. Relying almost exclusively upon law review notes and cases from other jurisdictions in dismissing the legislature's justifications, we simply re-found the legislative facts differently and opined that more people would now be "injured or killed by design or workmanship." *See id.* at 681–83.

¶ 120 I recognize that we should not lightly overrule our prior cases. *See State v. Menzies*, 889 P.2d 393, 398–400 (Utah 1994). The burden is on me to demonstrate why that step is necessary. As the sole open dissenter today from our continued adherence to *Berry*'s analytic scheme, and as one who heretofore has attempted to make it work in case after case, I recognize that I carry a particularly heavy burden.[6] But I have finally become convinced that the past fourteen years under the *Berry* regime have shown that decision's operative test to be deeply flawed in its formulation and articulation. More importantly, a thorough parsing of article I, section 11 demonstrates to me that *Berry* incorrectly concluded that the open courts provision provides very specific substantive limitations on the legislature. I will first address the shortcomings of *Berry*'s analytical model in order to better explain why the constitutional protections of

article I, section 11 are procedural, not substantive.

¶ 121 The *Berry* test suffers from two fundamental failings. First, *Berry* never clearly dealt with the question of precisely what interests the open courts provision protected. *Berry* simply assumed that the right to recover for an injury caused by a product fell within the protection of the provision and moved on to analyze the validity of the legislature's attempt to limit that right. Second, the second prong of the *Berry* test has proven to be such a strict standard in application that it can rarely be satisfied, thus depriving the legislature of any discretion in the area. I address these failings in turn.

¶ 122 First, *Berry* did not identify the interests protected by article I, section 11. That provision states that "every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law." Utah Const. art. I, § 11. *Berry* claimed that under its interpretation, "neither the due process nor the open courts provision constitutionalizes the common law or otherwise freezes the law governing private rights and remedies as of the time of statehood." *Berry*, 717 P.2d at 676. Indeed, *Berry* recognized that "one of the important functions of the Legislature is to change and modify the law that governs relations between individuals as society evolves and conditions require." *Id.* However, because of *Berry*'s failure to articulate a test for determining the rights to be protected, courts implementing *Berry* over time resorted *sub silentio* to the common law as declared by this court in its decisions, either as it existed in 1896 or presently, as the definition of the article I, section 11 protected rights.[7] The consequence of adopting this court's common law varied, depending upon the particular

---

6. Justice Stewart finds something troublesome in the fact that I now state that I erred in following *Berry* over the years. He suggests that by calling for the overturning of *Berry*, I am displaying a flawed judicial temperament. *See* ¶ 38. In response, I reject any formulation of a judge's duty that precludes him or her from rethinking issues in light of experience and from admitting past mistakes.

7. As I discuss below, focusing on the common law and thereby constitutionalizing the common law was an inevitable result of *Berry*'s conclusion that the open courts provision imposed substantive limitations on the legislature.

legislative limitation at issue. *Berry*'s progeny can be divided into two categories: those cases involving expansion of governmental immunity and those concerning limitations on any other common law cause of action. Together, these two lines of cases have shown that whatever the laudable motivation underlying it, the *Berry* analytical model is unworkable, leads to strained analyses and quixotic results, and distorts the relationship between the legislature and the courts. I address these two lines of cases in turn.

¶ 123 The first of these lines of cases concerns governmental immunity. In this context, despite *Berry*'s disclaimer that article I, section 11 does not constitutionalize the common law as it existed at statehood, the cold fact is that whether a cause of action existed in 1896 has become the determinative factor for whether article I, section 11 is transgressed by the enactment of governmental immunity. For example, in *McCorvey v. Utah State Department of Transportation*, 868 P.2d 41, 47–48 (Utah 1993), we found that section 63–30–34(1), which imposes a cap on damages recoverable from governmental entities, did not violate article I, section 11 under the facts of that case, because at common law there was no right to recover from the state for injuries resulting from the negligent maintenance of public roads. Similarly, in *DeBry v. Noble*, 889 P.2d 428, 435 (Utah 1995) (citing *Madsen v. Borthick*, 658 P.2d 627, 629 (Utah 1983)), we reiterated that "the scope of the protections afforded by article I, Section 11 had to be viewed in light of the immunities that were recognized when the Utah Constitution was adopted." [8] *DeBry* then proceeded to determine that the inspection of buildings and the issuance of temporary occupancy permits are government activities that were immune from liability under the legal regime that existed at the time of statehood. Therefore, we concluded that subsections 3 and 4 of

section 63–30–10, which excepted such activities from the general waiver of immunity for injuries caused by negligence, did not run afoul of article I, section 11.

¶ 124 Absurd results can occur when the existence of an action at common law at the time of statehood is used as the litmus test for determining whether an article I, section 11 right is involved. For example, while no right of action existed at common law to sue the *state* for negligence in maintenance of public roads, *McCorvey*, 868 P.2d at 47, a right of action existed at common law to sue a *city* for negligence in maintenance of public roads. *See Bowen v. Riverton City*, 656 P.2d 434, 437 (Utah 1982); *Bills v. Salt Lake City*, 37 Utah 507, 512–15, 109 P. 745, 746–47 (Utah 1910). No coherent policy reason exists for distinguishing between the individual injured on a state road within city limits and the individual injured on a city road. Yet, this accident of history in the development of the common law at statehood is outcome determinative under *Berry*.

¶ 125 Another example of the difficulty of using the common law at statehood as the test for determining whether a constitutional right exists is *Day v. State*, 882 P.2d 1150 (Utah Ct.App.1994), *cert. granted*, 892 P.2d 13 (Utah 1995). *Day*, with facts somewhat analogous to this case, involved an automobile accident between the plaintiff and a police suspect being closely pursued by a highway patrol officer. *See id.* at 1151–52. The plaintiff was struck by the fleeing suspect when the suspect ran through a red light. *See id.* at 1152. The plaintiff brought suit against the Utah Highway Patrol and the individual trooper involved in the case, but the trial court granted summary judgment for the defendants on the basis of section 63–30–7(2) of the Utah Code (Supp.1990) (repealed by Act of Feb. 27, 1991, ch. 76, § 10, 1991 Utah Laws 230, 233), which provided immunity to both defendants under the facts of that case. *See id.*

---

**8.** Justice Stewart spends some time discussing whether *Madsen* expresses reverence for the law as of statehood and criticizing me for mischaracterizing that case. Whether or not *Madsen* cared about the law at statehood does not concern me, since *Madsen* precedes *Berry*, the starting point

of our current predicament. Whether *DeBry* legitimately relied on *Madsen* is irrelevant. The point is that *DeBry* did demonstrate concern that governmental immunity be measured by standards that were reflective of its dimensions at statehood.

¶ 126 To determine whether that grant of immunity was constitutional under the *Berry* analysis, the court of appeals first determined whether a cause of action existed at statehood under the facts of that case. In so doing, the court of appeals was reduced to searching for cases near the turn of the century involving hot pursuit by a law enforcement officer of a fleeing suspect, presumably on foot or by horse, bicycle, or buggy. *See id.* at 1157–58. Finding no cases on this issue, the court of appeals stated the obvious: "Certainly the likelihood of harm at the turn of the century to an innocent bystander was considerably less from *pursuit by horseback as compared to high speed automobiles* on congested streets and highways." *Id.* at 1158 (emphasis added). Ultimately, the court of appeals was forced to rely on a case involving a state deputy sheep director, who allegedly had negligently imposed a quarantine, to determine whether a cause of action would have existed under the common law at statehood. *See id.* (finding *Garff v. Smith*, 31 Utah 102, 86 P. 772 (1906), necessitated conclusion that cause of action would not lie at common law under facts of *Day* ). In conclusion, the court of appeals admitted: "Our determination of common law remedies existing at or near the time of statehood is simply our best assessment of what a court during that era would have ruled if the issue had arisen." *Id.*

¶ 127 *Day* provides a clear example of why *Berry* has proven to be unworkable in the area of governmental immunity. Courts are required to engage in an analytical wild goose chase for common law cases that are on point with a modern-day controversy. The increasing complexity of society has multiplied the variety of cases brought today compared to 1896. This variance in the fact patterns presented in contemporary cases compared to those at statehood places courts in the awkward position of trying to force current cases into pigeon holes crafted by the common law of 1896. Furthermore, because the fit between current controversies and the common law at statehood is so imprecise and because the state of the common law at statehood is so difficult to determine, given the relative paucity of prestatehood decisions by this court, the 1896 common law standard is subject to manipulation. *Compare Ross v. Schackel*, 920 P.2d 1159, 1162–65 (Utah 1996) (majority relying upon *Garff* to conclude that prison doctor's provision of medical services to prisoners was discretionary at statehood and that, therefore, no cause of action existed at statehood for negligent provision of care) *with id.* at 1171 (Stewart, Assoc.C.J., dissenting) (relying on *Richardson v. Capwell*, 63 Utah 616, 176 P. 205 (1918), which held that jailers may be held liable for negligence in failing to provide food to prisoners, to conclude that medical care is ministerial and that, therefore, prison doctors were liable at statehood for negligence). Due to the enigmatic condition of the common law regarding whether a particular act was ministerial or discretionary at statehood, *Berry* creates incentives for judges to determine the constitutionality of a statute on the basis of whether an action existed at common law rather than by *Berry* 's due process balancing test, because once this initial decision is made, the constitutionality of the statute has effectively been determined.[9] *Compare id.* at 1166 (stating that because no cause of action existed at statehood, immunity statute is constitutional) *with id.* at 1176 (Stewart, Assoc.C.J., dissenting) (finding that cause of action existed at statehood and then declaring, without analysis, that immunity statute is therefore unconstitutional "because it deprives [plaintiff] of a remedy by due course of law for an injury to his [or her] person"). These problems alone place a cloud of doubt over the validity of the post-*Berry* line of cases on governmental immunity, which effectively exalt the fruits of questionable legal archeology over the decisions of the legislature to modernize the judicially created governmental immunity law.

---

**9.** As I explained above when discussing *Berry* and the extreme lack of deference contained in the second prong of its test, a statute is almost certain to be declared unconstitutional once the *Berry* test is triggered. Additional problems flowing from the strictness of the *Berry* test are explored in greater detail below.

¶ 128 Turning next to the post-*Berry* line of cases dealing with issues other than governmental immunity, I note that the common law at statehood has played a less significant role. These cases therefore avoid the difficulty of finding that the constitution deems sacred the common law as it existed at statehood. However, these cases suffer from their own analytical infirmities.

¶ 129 Instead of focusing exclusively on the common law of 1896, these cases state that the legislature cannot restrict any judicially created cause of action, no matter when created, unless the legislature can show that it has provided an alternative remedy or that there is a clear social or economic need for the restriction. *See Berry,* 717 P.2d at 680 ("[A]brogation of the remedy *or cause of action* may be justified only if there is a clear social or economic evil to be eliminated and the elimination of an existing legal remedy is not an arbitrary or unreasonable means for achieving the objective." (emphasis added)); *see also Cruz v. Wright,* 765 P.2d 869, 871 (Utah 1988) (determining whether legislature had sufficiently strong justifications for abolishing common law loss-of-consortium cause of action). As a result, *Berry* has distorted the relationship between the legislature and the courts when it comes to who is in charge of making the law. Under orthodox notions of priority, the common law, made by judges alone, can be modified or superseded by any legislative act. *See* 15A Am.Jur.2d *Common Law* § 18 (1976). A legislative act can be struck down only if it conflicts with a constitutional provision. *See* 16 Am.Jur.2d *Constitutional Law* §§ 3, 70, 150 (1979). But *Berry,* by the device of importing the common

law into the constitution, has exalted the common law—the judge-made law that is at the bottom of the law-making pecking order—to the top, beyond the legislature's effective reach. Thus, this court is placed in the position of gatekeeper of any effort of the legislature to restrict any common law cause of action, no matter when created. Absent our finding that the legislature has offered a justification that we are satisfied with, it cannot so act.[10]

¶ 130 This gatekeeper role is in tension with traditional notions of the separation of powers doctrine. Article V, section 1 of the Utah Constitution provides:

> The powers of the government of the State of Utah shall be divided into three distinct departments, the Legislative, the Executive and the Judicial; and no person charged with the exercise of powers properly belonging to one of these departments, shall exercise any functions appertaining to either of the others, except in cases herein expressly directed or permitted.

Utah Const. art. V, § 1. Article VI, section 1 adds: "The Legislative power of the State shall be vested . . . [i]n a Senate and House of Representatives which shall be designated the Legislature of the State of Utah. . . ." Utah Const. art. VI, § 1.

¶ 131 We delineated the scope of these provisions in *Ritchie v. Richards,* 14 Utah 345, 363, 47 P. 670, 675 (1896), where we stated: "The power to declare what the law shall be is legislative. The power to declare what is the law is judicial." Furthermore, we noted in *Salt Lake City v. Utah Light &*

---

10. *Berry* permits the legislature to create new causes of action or limit the scope of governmental immunity, but the legislature may not cut back on any cause of action without meeting the very high threshold set by this court's *Berry* test. As we stated in *DeBry,* "the restriction or abolition of an immunity raises no constitutional issue under article I, section 11 because a restriction or an abolition serves only to enhance, not diminish, the rights protected by that provision." 889 P.2d at 436; *see also Ross,* 920 P.2d at 1169 & n. 4 (Stewart, Assoc.C.J., dissenting). This one-way street analysis for legislative changes in the common law severely curtails the legislature's ability to "declare what the law shall be."

*See Ritchie v. Richards,* 14 Utah 345, 363, 47 P. 670, 675 (1896). Yet, this court is not similarly constrained in its development of the common law. This court has permitted itself the right to do away with causes of action without meeting the stringent *Berry* test. *See Jackson v. Brown,* 904 P.2d 685, 687 (Utah 1995) (abolishing action for breach of promise to marry without conducting *Berry* analysis even though this court had previously recognized such an action); *Norton v. Macfarlane,* 818 P.2d 8, 16–17 (Utah 1991) (finding that nothing in *Berry* opposes the abolition of "obsolete causes of action").

*Traction Co.* that article I, section 11 does not allow this court to "reach out and usurp powers which belong to another independent and co-ordinate branch of the state government." 52 Utah 210, 227, 173 P. 556, 563 (1918). Though the general principles of separation of powers do not require us to interpret article I, section 11 to retreat from constitutional analysis of legislative enactments, *Berry* has, as I noted above, distorted the relationship between the legislature and the judiciary by effectively constitutionalizing the common law as we determine it by very opaque hindsight. The legislature, not this court, is primarily charged with making the determination of the degree to which the law will recognize an injury. Such a determination involves the social policy choices best left to the citizens of this state acting through their elected legislators.[11] This separation of powers conflict is most troubling in the post-*Berry* line of cases dealing with issues other than governmental immunity, because this court can continue to develop the common law either by eliminating or creating common law causes of action, but the legislature may only eliminate or modify a common law action, no matter when created, if the legislature can meet the difficult showing required under *Berry*. However, the governmental immunity line of cases also creates tension under the separation of powers doctrine, because in those cases, the legislature's ability to expand governmental immunity is shackled by the judge-created common law as it existed in 1896.

¶ 132 When viewed in the historical context of this state, the validity of both lines of post-*Berry* cases is dubious. The *Berry* court said that "the common law at the time of statehood provides at least a measure of the kinds of legal rights that the framers must have had in mind for the protection of life, property, and reputation." *Berry*, 717

P.2d at 676 n. 3. However, little reason exists for thinking that the drafters held the common law in such high regard. The early Mormon settlers of Utah were hostile to the common law, lawyers, and courts. As a result, there are relatively few reported cases in Utah in the almost fifty years between settlement and statehood. Most private controversies were either dealt with in Mormon ecclesiastical courts or mediated informally through local means. *See* Edwin B. Firmage, *Religion and the Law: The Mormon Experience in the Nineteenth Century*, 12 Cardozo L.Rev. 765, 788, 794 (1991). The hostility toward the common law is perhaps best illustrated by an early Utah territorial law that actively repudiated the common law, stating:

> [N]o laws nor part of laws shall be read, argued, cited, or adopted in any court, during any trial, except those enacted by the Governor and Legislative Assembly of this Territory, and those passed by the Congress of the United States when applicable; and no report, decision, or doings of any court shall be read, argued, cited, or adopted as precedent in any other trial.

Laws, Territory of Utah ch. LXIV, 260 § 1 (1855). Additionally, unlike many states, Utah does not have a provision in its constitution that adopts the common law as the rule of decision in its courts. The common law was not adopted as the rule of decision in Utah courts until 1898, when the legislature enacted a statute adopting the common law. *See* Revised Statutes of Utah, ch. 2 1898, title 65, § 2488 (currently codified at Utah Code Ann. § 68–3–1). Even that statute qualifies the common law adoption, stating:

> The common law of England so far as it was not repugnant to, or in conflict with, the constitution or laws of the United States, or the constitution or laws of this state, and so far only as it is consistent

---

11. By way of illustration, take for example the situation where a nonnegligent motorist injures a pedestrian. Whether the pedestrian's injury should be legally cognizable involves difficult social decisions. How necessary are automobiles for traveling in this state? How does this need balance against the risks to pedestrians? What party can more easily bear the economic burden of the injury? The decision by the members of this court regarding these issues should not be viewed as being so unquestionably infallible that the people of this state, acting through their legislature, cannot resolve the liability question differently than we.

with and adapted to the natural and physical conditions of this state and the necessities of the people hereof, is hereby adopted, and shall be the rule of decision in all courts of this state.

Utah Code Ann. § 68–3–1 (1998). An interpretation of article I, section 11 as constitutionalizing in 1896 the common law, which was not even qualifiedly made the law of the state until 1898, is inconsistent with this history.

¶ 133 Furthermore, *Berry*'s constitutionalization of the common law is inconsistent with our pre-*Berry* case law. Pre-*Berry* jurisprudence on article I, section 11 focuses on the procedural guarantee of the provision, not on substantive protection. Both *Salt Lake City v. Utah Light & Traction Co.*, 52 Utah 210, 173 P. 556 (1918), and *Brown v. Wightman*, 47 Utah 31, 151 P. 366 (1915), reflect a procedural interpretation of article I, section 11. In *Utah Light & Traction Co.*, we stated that article I, section 11 "applies only to judicial questions." 52 Utah at 227, 173 P. at 563. This statement indicates that the open courts provision concerns only injuries and remedies recognized by law and, therefore, does not provide substantive limitations on the legislature, but instead is a procedural guarantee. This interpretation is even more apparent in *Brown*, where we stated, "Where no right of action is given . . . or no remedy exists, under either the common law or some statute, [open courts] provisions create none." 47 Utah at 34, 151 P. at 367; *see also Madsen v. Borthick*, 658 P.2d 627, 629 (Utah 1983) ("Article I, § 11 . . . was not meant to create a new remedy or a new right of action."). Elaborating on this point, the *Brown* court added:

> The right and power, as well as the duty, of creating rights and to provide remedies, lies with the Legislature, and not with the courts. Courts can only protect and enforce existing rights, and they may do that only in accordance with established and known remedies.

47 Utah at 34, 151 P. at 367. This passage from *Brown*, a case decided less than twenty years after the constitution's adoption, focuses exclusively on the procedural guarantee of article I, section 11: Courts are open to give due process for existing rights by providing established remedies, but the legislature possesses the power to determine what rights are enforceable and to establish remedies.

¶ 134 Later, in *Masich*, 113 Utah at 124, 191 P.2d at 624, we stated the well-settled legal principle that "no one has a vested right in any rule of law." Proceeding from this statement, we noted that "both statutory rights and common law rights can be taken away[;] otherwise, there can be no question that acts which abolish actions for seduction, breach of promise, criminal conversation, and alienation of affections, would be unconstitutional." 113 Utah at 124–25, 191 P.2d at 624. Justice Wolfe, speaking directly to the question of the legislature's power to change the common law, wrote:

> I do not understand that Article I, Sec. 11, of the Constitution of Utah, prohibits the modification or even the entire removal or destruction of a common law right by legislative enactment. There is still such a thing as damnum absque injuria [damage without the violation of a legal right]. . . . I see no reason why the common law which recognized rights, duties and liabilities to meet the conditions of a certain period may not later recede from those or modify them if the needs of the people require that.

113 Utah at 128, 191 P.2d at 626 (Wolfe, J., concurring). In light of this history, *Berry* and its progeny's almost casual operative placement of the common law on a pedestal is quite incongruous.

¶ 135 I next move on to consider *Berry*'s second major problem or failing: the extreme strictness in application of the second prong of its test. As formulated and applied by this court, the second prong of the *Berry* analysis, which requires the legislature to justify its limitation by showing that "there is a clear social or economic evil to be eliminated and the elimination of an existing legal remedy is not an arbitrary or unreasonable

means for achieving the objective," has placed the courts' common law beyond the legislature's reach. *Berry,* 717 P.2d at 680 (citations omitted); *see also Horton,* 785 P.2d at 1094–95 (summarily dismissing justifications for architects and builders statute of repose); *Sun Valley,* 782 P.2d at 193 (same); *Berry,* 717 P.2d at 681–83 (relying on law review notes and cases from other jurisdictions to dismiss justifications for products liability statutes of repose). Such an impediment to modifications of the common law exacerbates the separation of powers problem with *Berry*'s constitutionalization of the common law, is inconsistent with the legislature's constitutional role in remedying defects in the common law, and is particularly ironic given the position of the common law in the normal hierarchy of laws and the fact that the common law is the rule of decision in all courts of this state by virtue of the 1898 legislative decision to adopt the common law by statute. *See* Utah Code Ann. § 68–3–1 (1996).

¶ 136 The problem with the severe strictness of the *Berry* test is perhaps better understood in light of the history of article I, section 11 jurisprudence in this state. Since *Berry* was issued, we have experienced a proliferation in the number of cases arguing that the legislature has abridged article I, section 11. During the eighty-nine years prior to *Berry,* we never once found an act unconstitutional under article I, section 11. In the past twelve years from *Berry* onward, we have issued three cases striking down statutes as interfering with causes of action that we concluded were insulated from legislative tampering absent a strong showing of necessity. *See Horton,* 785 P.2d at 1096 (striking down architects and builders statute of repose as unconstitutional); *Sun Valley,*

782 P.2d at 194 (same); *Berry,* 717 P.2d at 683 (striking down products liability statutes of repose). Additionally, several justices, including myself, have relied upon *Berry* to state that they would find particular statutes unconstitutional. *See Ross,* 920 P.2d at 1168 (Stewart, Assoc. C.J., dissenting, joined by Durham, J.) (arguing that section 63–30–4 is unconstitutional under article I, section 11); *Bott v. DeLand,* 922 P.2d 732, 744–45 (Utah 1996) (Stewart, Assoc. C.J., dissenting, joined by Durham, J.) (same); *Lee v. Gaufin,* 867 P.2d 572, 590–92 (Utah 1993) (Zimmerman, J., concurring in the result, joined by Hall, C.J.) (relying on *Berry* to strike down medical malpractice statute of repose); *Condemarin v. University Hosp.,* 775 P.2d 348 (Utah 1989) (divided court striking down damage cap on basis of either open courts or uniform operation); *see also Crawford v. Tilley,* 780 P.2d 1248, 1252 (Utah 1989) (interpreting Landowner Liability Act in manner that avoided conflict with article I, section 11). Before today, on only one occasion have we been satisfied with the legislative justification for limiting any common law cause of action created by this court. *See Cruz v. Wright,* 765 P.2d 869, 871 (Utah 1988) (upholding 1898 Married Woman's Act, which abolished husband's common law action for loss of consortium, under perfunctory *Berry* analysis).[12] The significance of the *Cruz* holding is diminished by the extreme length of time since the passage of the 1898 Married Woman's Act, by the dubious existence of an action for loss of consortium in Utah common law, and by the fact that two prior cases of this court, one decided only one year earlier, had not found any constitutional problem with the Act. *See Hackford v. Utah Power & Light Co.,* 740 P.2d 1281, 1286–87 (Utah 1987); *Tjas v. Proctor,* 591 P.2d 438 (Utah 1979).

---

12. Today's decision, as I noted earlier, is significant only insofar as it shows how easily the balancing test of *Berry* can be manipulated. Today it is used in a manner inconsistent with *Berry* and its progeny, particularly *Sun Valley.* Today the test produces a result that upholds legislative action without giving up this court's claim of authority to strike down another legislative action if the spirit moves us.

But it is possible that today's decision is also significant in another way. Because it departs

so significantly from our prior cases in its application of the second prong of the *Berry* test, today's ruling may indicate that some members of this court are uneasy with *Berry*'s legacy of judicial supremacy and wish to temper it by *sub silentio,* modifying how *Berry* is applied. The better course, in my view, is to be candid and overrule *Berry* outright.

¶ 137 I further note that legal scholars writing on open courts provisions have observed the problems of *Berry*'s approach and have targeted it for criticism. One scholar was particularly critical of *Berry*'s lack of deference to the legislature, writing:

> The *Berry* opinion is typical of the activist use of the remedies provision against products liability statutes of repose. *The standard of review of the statute in question is extremely strict.* The court looked no further than the stated legislative objectives. It did not consider additional plausible or even possible justifications such as the need for administrative efficiency and the need for an adjustment to the substantive law of products liability. A statute of repose could, for example, be thought to return products liability to its origins in warranty law. In addition, the decision here put the burden on the statute to be a rational means of correcting a clear social or economic evil. When the court found plausible arguments questioning the efficacy of statutes of repose in reducing the cost of product liability insurance, *the law was found unconstitutional in the absence of compelling evidence that it would have the desired legislative effect.*

John H. Bauman, *Remedies Provisions in State Constitutions and the Proper Role of the State Courts,* 26 Wake Forest L.Rev. 237, 270 (1991) (emphasis added) (footnotes omitted). These scholars also express concern that *Berry* usurps the legislature's power to make laws. *See* David Schuman, *The Right to a Remedy,* 65 Temp. L.Rev. 1197, 1215–16, 1217–18 (1992) (stating that approaches like *Berry* "permit courts to act like legislatures"). By constitutionalizing our most recent pronouncements on the common law, *Berry* effectively "place[s] [this court's] view of public policy before that of the legislature and declare[s] it inviolable." *See* John H. Bauman, *supra,* at 283.

¶ 138 The net result of the two problems of *Berry* and its progeny has been that this court's decisional law in the tort area has become enshrined as constitutionally protected from legislative modification and this court has set itself up as the final factual arbiter of the legitimacy of legislative purposes used to justify attempts to change that decisional law, granting absolutely no deference to the legislature as a judge of the need to modify that decisional law. This result would be acceptable if an interpretation of the plain language of article I, section 11 supported it or if the history of this state suggested that the ambiguous language should be interpreted to achieve this result. However, neither is the case.

¶ 139 The plain language of article I, section 11 does not mandate a substantive interpretation that constitutionalizes the common law. That provision states:

> *All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, which shall be administered without denial or unnecessary delay;* and no person shall be barred from prosecuting or defending before any tribunal in this State, by himself or counsel, any civil cause to which he is a party.

Utah Const. art. I, § 11 (emphasis added). The emphasized language is central to understanding the scope of protection afforded by the open courts provision in the context of immunity statutes and damage caps. The emphasized portion contains four interrelated phrases: (i) "All courts shall be open," (ii) "every person, for an injury done to him in his person, property or reputation," (iii) "shall have remedy by due course of law," and (iv) "which shall be administered without denial or unnecessary delay." The last phrase, requiring the courts to administer a person's right to a remedy by due course of law *"without denial or unnecessary delay,"* is plainly a procedural guarantee, directing the courts to provide due process of law without denial or unnecessary delay. *See id.* (emphasis added). The command "[a]ll courts shall be open" is also a procedural right: The courts shall be available to provide remedies for legal injuries. This leaves the two phrases, here stated as a single phrase, "every person, for an injury done to

him in his person, property or reputation shall have remedy by due course of law," as the only possible justifications for a substantive interpretation constitutionalizing the common law. I therefore next address the meaning of these phrases.

¶ 140 I dismiss from the start any notion that these two phrases guarantee a remedy for every injury. The law simply does not recognize that every harm suffered should be compensated. The principle *damnum absque injuria*, that there can be damage without the violation of a legal right, is too well established in our jurisprudence to give such an expansive interpretation to the obscure phrasing of the open courts provision. *See Demman v. Star Co.*, 28 Utah 2d 50, 497 P.2d 1378, 1380 (1972); *Taylor v. United Homes, Inc.*, 21 Utah 2d 304, 445 P.2d 140, 141 (1968); *Tiller v. Norton*, 123 Utah 42, 253 P.2d 618, 620 (1953); *Gibbs v. Blue Cab, Inc.*, 122 Utah 312, 249 P.2d 213, 216 (1952). A more thoughtful analysis is required to understand these phrases. For the sake of analytical clarity, I will examine each phrase separately.

¶ 141 I first consider the meaning of the phrase "every person, for an injury done to him in his person, property or reputation," because until there has been such an injury, the remedy issue does not arise. To understand the meaning of this phrase, one must determine what is an "injury." Unfortunately, the word "injury" is ambiguous, and the open courts provision does not provide any guidance as to the meaning of "injury." I have already rejected interpreting "injury" to mean any harm to person, property, or reputation; therefore, "injury" must have a more restrictive definition. The obvious solution is to define "injury" as any "legal injury." In other words, an "injury" is a harm to person, property, or reputation that will support a cause of action.

¶ 142 This interpretation of "injury" is to this point consistent with *Berry*'s interpretation. However, I diverge from *Berry* in my method for determining what is a "legal injury." *Berry* erred by interpreting the open

courts provision to place a substantive limitation on the legislature's ability to change the law regarding what constitutes an "injury." Because *Berry*'s focus was on the *change* enacted by the legislature, *Berry* effectively defined "legal injury" as any injury that is or was recognized at some point in this state's history as an injury that supported a cause of action. Though *Berry* tried to avoid constitutionalizing the common law, *see* 717 P.2d at 676, this result was an inevitable consequence of *Berry*'s substantive interpretation of the open courts provision.

¶ 143 By giving article I, section 11 a substantive interpretation, *Berry* left the courts with the need to find some baseline against which to judge legislative alterations of the law. Only when the legislature changes the law and thereby deprives a person of a remedy that could have been received prior to the change does an article I, section 11 question arise. The question in such cases becomes whether the legislature can justify the change from the earlier state of the law. Because judge-made common law existed prior to legislatively made statutory law, the common law is the baseline against which such changes in the law must eventually be judged.

¶ 144 Interpreting the open courts provision to contain substantive protection of particular causes of action, thereby constitutionalizing the common law, is made absurd by the fact that Utah is a state that has a history, prior to statehood, of abjuring the common law entirely. This interpretation is also inconsistent with our pre-*Berry* case law, which, as I noted above, focused on the procedural guarantee of the open courts provision. Given the inconsistency of *Berry*'s interpretation of the open courts provision with this history, a substantive interpretation is cast into even greater doubt because of the tension it creates under the separation of powers doctrine of article V, section 1 of the Utah Constitution.

¶ 145 All this has, as noted above, distorted the relationship that ordinarily would be thought to obtain between the legislature and

the judiciary respecting common law causes of action. Any such shift in all the ordinary assumptions about who is in charge of what functions cannot realistically be thought implicit in the vague generalization of article I, section 11. I conclude that *Berry* erred by reading such a fundamental shift in the relationship into the malleable language of article I, section 11.

¶ 146 Having rejected *Berry*'s reading of article I, section 11, it is incumbent on me to offer an alternative interpretation, one that addresses the need to make the provision meaningful and consistent with related constitutional provisions. First, to determine whether an "injury" to person, property, or reputation has occurred, we should look to the statutes and common law in existence at the time of the accrual of the claim. Thus, I would find that the open courts provision permits the legislature to abolish or limit both statutory and common law causes of action.

¶ 147 Having resolved how to define "injury," I would next determine the meaning of the phrase "shall have remedy by due course of law." As was the case with the term "injury," the open courts provision does not provide any guidance as to the precise meaning of "remedy." But the term "remedy" is one that the courts have greater experience in applying. A "remedy" is "[t]he means by which a right is enforced or the violation of a right is prevented, redressed, or compensated." *Black's Law Dictionary* 1294 (6th ed.1990). Though we know what a "remedy" is, we still face the task of demarcating the scope of the remedy guarantee.

¶ 148 Turning to this task, I initially note that the open courts provision provides scant indication as to the extent of the remedy guarantee. Even so, dissecting the language of the open courts provision, two profitable clues are found. First, the provision states that "every person, for an injury done to him in his person, property or reputation *shall have remedy*." Utah Const. art. I, § 11 (emphasis added). Thus, the plain language of article I, section 11 prohibits the legisla-

ture and the courts from denying entirely any remedy for a legal right. *Cf. Noonan v. City of Portland*, 161 Or. 213, 88 P.2d 808, 822 (1938) ("The legislature cannot ... abolish a remedy and at the same time recognize the existence of a right."). Second, the provision does not merely state "shall have remedy" but instead provides "shall have remedy *by due course of law.*" Utah Const. art. I, § 11 (emphasis added). This serves to cast the remedy guarantee in a procedural light. The subsequent phrase "which shall be administered without denial or unnecessary delay" reinforces this procedural emphasis. *See id.* Parties suffering legal injuries shall have remedy according to the dictates of the substantive law governing their action.

¶ 149 This procedural interpretation of the remedy guarantee is bolstered by the procedural nature of the injury clause and by our early article I, section 11 jurisprudence. First, as to the support provided by the injury clause, I note that interpreting the remedy guarantee to contain substantive limitations on the legislature's ability to limit remedies would be anomalous given the fact that the legislature possesses the greater power to abolish the cause of action. Second, regarding our pre-*Berry* cases, these cases deferred not only to the legislature's power to create rights, but also to the legislature's power to establish remedies. For example, the court in *Brown* stated:

> The right and power, as well as the duty, of creating rights and to provide remedies, lies with the Legislature, and not with the courts. Courts can only protect and enforce existing rights, and they may do that only in accordance with established and known remedies.

*Brown v. Wightman*, 47 Utah at 34, 151 P. at 367. For these reasons, I conclude that the remedy guarantee of the open courts provision provides procedural, not substantive, rights.

¶ 150 I recognize that this conclusion is inconsistent with my prior opinions in *Lee v. Gaufin*, 867 P.2d at 590–92; *Horton v. Goldminer's Daughter*, 785 P.2d at 1096 (Zimmer-

man, J., concurring); and *Condemarin v. University Hospital*, 775 P.2d at 366–69 (Zimmerman, J., concurring in part). However, as this court has applied the *Berry* test in an increasing number of cases, the problems with *Berry* have become more apparent to me, prompting this review of that opinion and article I, section 11. As this analysis demonstrates, *Berry*, in its attempt to closely review tort reform legislation, led to the constitutionalization of the common law and to too-close scrutiny of the legislation.

¶ 151 Although I depart today from *Berry* and its substantive interpretation of article I, section 11, I believe there are other adequate grounds to prevent the legislature from unreasonably limiting the ability of the citizens of this state to recover for injuries to person, property, or reputation. But, having said that, I acknowledge that I would largely withdraw from an area of substantive law and leave the field in the hands of the legislature. Whatever misgivings I may have about the potential consequences of that decision, this court cannot continue to operate on the basis that we alone are entrusted with ensuring that tort violations are dealt with fairly. That burden legitimately rests on the shoulders of the legislature. Furthermore, my review of jurisdictions that interpret their open courts provisions procedurally reveals that the legislatures in those states have not declared war on common law causes of action. Commentators on remedies provisions have made the same observation. *See, e.g.*, John H. Bauman, *supra*, at 276 ("[F]ew common law causes of action have ever been abolished outright."). Thus, I trust that the legislature would bear its burden responsibly.

¶ 152 To summarize, I conclude that the open courts provision is a procedural guarantee. Because the open courts provision does not place substantive limitations on the legislature, the legislature may eliminate a cause of action, narrow the factual circumstances that will give rise to any particular cause of action, or limit the remedies available for a legal injury. Of course, the power of the legislature to make such changes in the law is limited by other constitutional provisions, including article I, section 7 (due process clause); article I, section 22 (takings clause); article I, section 24 (uniform operation); and article XVI, section 5 (wrongful death actions). *See, e.g., Bott v. DeLand*, 922 P.2d 732, 744 (Utah 1996) (striking down statutory cap on damages under article I, section 9); *Lee v. Gaufin*, 867 P.2d 572, 589 (Utah 1993) (striking down statute of repose under article I, section 24). Furthermore, the legislature is also constrained in that it cannot make modifications affecting vested rights. That is, once the right to an action vests, the legislature is not free to thereafter eliminate the cause of action. As we stated in *Sun Valley*:

> "[O]nce a cause of action under a particular rule of law accrues to a person by virtue of an injury to his rights, that person's interest in the cause of action and the law which is the basis for a legal action becomes vested, and a legislative repeal of the law cannot constitutionally divest the injured person of the right to litigate the cause of action to a judgment."

782 P.2d at 192 (quoting *Berry*, 717 P.2d at 676); *see also Payne v. Myers*, 743 P.2d 186, 190 (Utah 1987). I note that this exception to the legislature's ability to change the law is nearly universal. *See* David Schuman, *supra*, at 1206.

¶ 153 The procedural protection afforded by article I, section 11 is not empty. I conclude that it prohibits both the courts and the legislature from closing the doors of the courts to any person who has a legal right to vindicate. Applying the open courts provision's procedural limitations on the legislature is consistent with our pre-*Berry* cases. While these early cases concentrated on the procedural requirements of article I, section 11, they did not limit that provision to being a mere mandate to the courts to provide due process. In 1914, in *Union Savings & Investment Co. v. District Court*, we stated, "[Article I, section 11] is merely a reiteration of the pre-existing common-law right [that courts must be open] *with a limitation preventing the Legislature from in any way*

*impairing or curtailing that right.*" 44 Utah 397, 140 P. 221, 225 (1914) (emphasis added). Similarly, the court in *Brown v. Wightman* stated that article I, section 11 *"plac[ed] a limitation upon the Legislature* to prevent that branch of the state government from closing the doors of the courts against any person who has a legal right which is enforceable in accordance with some known remedy." 47 Utah at 34, 151 P. at 366–67 (emphasis added). These statements from *Union Savings & Investment Co.* and *Brown* concentrate on article I, section 11's command that "[a]ll courts must be open," and impose this command to limit the legislature. Though this limitation on the legislature is inconsistent with the interpretation that remedies provisions are directed only to the judiciary, it is consistent with a procedural interpretation of article I, section 11. As one commentator on open courts provisions explained, many procedural jurisdictions view their open courts provision to be directed only to the judiciary, but that a more logical interpretation "would be that the [open courts provision] applies against all impediments to fair judicial process, be they legislative or judicial in origin." David Schuman, *supra,* at 1203.

¶ 154 Based on the foregoing, I conclude that, for example, barriers to the courthouse such as extremely high filing fees, extraordinarily short statutes of limitation, or arduous pretrial procedures may violate article I, section 11. *See, e.g., Currier v. Holden,* 862 P.2d 1357, 1372 (Utah Ct.App.1993) (striking down three-month statute of limitations on petitions for habeas corpus as violative of article I, section 11). Additionally, the plain language of article I, section 11 would not permit the courts or the legislature to recognize a legal right but to entirely deny a remedy.[13]

¶ 155 Applying the foregoing principles to the instant case, I would hold that the challenged statute, section 78–12–25.5 of the Utah Code, does not violate article I, section

11 because the open courts provision does not limit the legislature's power to eliminate common law causes of action, and the statute does not otherwise run afoul of article I, section 11.

---

**13.** There may be a point at which the remedy provided is so insignificant or nominal as to not constitute a remedy as a matter of law.